# CHARLESTON.

BESS *v.* CHESAPEAKE & OHIO RAILROAD CO.

Submitted June 17, 1891.—Decided December 7, 1891.

1. DAMAGES—RAILROAD COMPANIES—EMPLOYER AND EMPLOYE.
    To charge a railroad company for the willful wrong of an employe in forcing a boy from a freight train while in motion, whereby he is injured, it must appear that the act was in the course of the employe's business and within the scope of his authority, the boy being a trespasser, not a passenger.

2. SPECIAL FINDINGS.
    A finding in answer to a particular question under sec. 5, ch. 131, Code (1887), inconsistent with a general verdict prevails over such general verdict, and judgment should be given according to the finding.

*Simms & Enslow* for appellant, cited 8 Kan. 647 ; Id. 659 ; 42 N. W. Rep. 237 ; Sedg. Lead. Cas. Meas. Dam. 738 ; 52 Ill. 183 ; 28 W. Va. 733 ; Bish. Non Con. Law § 1051, 1054 ; 12 S. E. Rep. 554 ; 15 W. Va. 628 ; 86 Pa. St. 418 ; 98 Pa. St. 498 ;  70 Pa. St. 119 ; 91 Pa. St. 256 ; 59 Ia. 428 ; 47 Wis. 144 ; Thomp. Trials § 2692.

*Gibson & Michie* for appellee, cited 4 Am. & Eng. R'y Cas. 562 ; 15 Wall. 401 ; 1 Shear. & Redf. Neg. (4th Ed.) §§ 71, 73 ;  Id. § 98  note 4 ; 40 Hun 605 ; 112 Pa. St. 551 ; 55 Ia. 496 ; 18 Ohio St. 399 ; 24 Ohio St. 670 ; 12 S. E. Rep. 348 ; 11 Gratt. 697 ; 4 Min. Inst. p't 1. 757 ; 64 Miss. 584 ; 31 Kan. 197 ; 61 Ia. 452 ; 18 Ill. 418 ; 39 Hun 5 ; 76 Tex. 421 ; 12 N. W. Rep. 237 ; 21 Ill. App. 580 ;  80 N. Y. 670 ; 12 S. W. Rep. 889 ; 88 Tenn. 710 ; 2 Am. & Eng. R'd Cas. 70 ; 22 Id. 306 ; 34 Id. 488 ; 25 Id. 446 ; L. R. 4 Q. B. 406.

BRANNON, JUDGE :

This is a writ of error taken by the Chesapeake & Ohio Railroad Company to a judgment in favor of James Walter

Bess, an infant suing by a next friend, against said company for twelve thousand dollars. On the 23 January, 1889, there were a number of freight cars standing on a side track in the City of Huntington, and said Bess, a boy nine years of age, got upon one of these cars, and an engine hitched to the train and while moving these cars Bess in getting off received an injury by the wheels mashing his right foot, which necessitated its amputation, and for this injury this suit was brought.

The claim of the plaintiff for recovery was, that while the train was moving some employe of the company commanded him to get off the car, and he refusing or hesitating, the employe got upon the car, and the little boy ran to the end of the flat car, stepped upon the bumper of a box car, and was getting off, having his foot in a stirrup used for descending from the car, holding with his hand to a ladder used for climbing to and from the top, and while there this employe kicked his hand, causing him to fall, so that his foot got under the wheel. A vital and material question on the trial was the identity of this employee, who he was and what the character of his employment and his duties.

In addition to its duty of finding a general verdict the court, under section 5, chapter 131 of the Code, required the jury to find upon the following particular questions of fact:

"1st. Was the plaintiff Walter Bess a trespasser on the train of the defendant at the time the accident occurred?

"2nd. Was the fact that he was on the train known to the defendant before the accident? If so, what agent or servant knew it?

"3rd. Was the plaintiff injured by being forced to jump off the moving train of the defendant? If so, what agent or servant forced him to jump?

"4th. Was the plaintiff kicked by an employe of the defendant and caused to fall under the wheels of the cars? If so, what employe was it?

"5th. If the plaintiff J. Walter Bess was kicked off the defendant's train by any employe of the company or forced to jump off by the defendant's employes, who was the employe and what was his position or employment?

"6th. Did any of the employes of the defendant who had control of the train in question kick or force the plaintiff off of the train? If so, who was it?"

The jury made the following answers to the questions propounded by the defendant, viz: "Ans. to ques. 1—Yes. Ans. to ques. 2—Yes, name unknown to the jury. Ans. to ques. 3—Yes, name unknown to the jury. Ans. to ques. 4—Yes, name unknown to the jury. Ans. to ques. 5— Name and business unknown to the jury. Ans. to ques. 6 —Yes, name unknown to the jury."

The defendant moved the Court to enter judgment for it on these findings upon the particular questions, but the Court refused to do so. Was this refusal error?

This question is to be solved on legal principles. First, the plaintiff, though a child, was in a legal view a trespasser, for he was on the car without right. He was not a passenger. The law draws a marked and sharp distinction between a passenger and a trespasser. In the case of a passenger, the carrier is not allowed to say that the assault or willful wrong of the servant was an excess, outside his duty, and his own personal act.

" It is among the implied provisions of the contract between a passenger and a railway company that the latter has employed suitable servants to run its trains, and that passengers shall receive proper treatment from them ; and a violation of this implied duty or contract is actionable in favor of the passenger injured by its breach, though the act of the servant was willful and malicious, as for a malicious assault upon a passenger committed by any of the train hands, whether within the line of his employment or not. The duty of the carrier towards a passenger is contractual, and among other implied obligations is that of protecting a passenger from insults or assaults by other passengers or by their own servants." 2 Wood, R'y Law, p. 1194. There is no inquiry in such case as to whether the wrong to the passenger is within the scope of his authority, or whether his act is wanton. This is a rule largely dictated by public policy and is based on a duty owing from the carrier to the passenger. Wood Mas. & Serv. § 321.

But in the case of a trespasser, no duty except absti-

nence from wanton injury and gross negligence lies upon the carrier, and the rule is different, for to make the carrier liable the wrong must be one done by the servant within the scope of his duty and in the course of his business. 2 Wood, R'y Law § 316, p. 12, states the principle thus : " While, in the case of passengers, because of the contractual duty existing on the part of the company, the question as to whether the servant committing the injury had authority express or implied, to do so, or, in other words, whether it was done in the line of his duty, is not material, yet, when the question arises between a trespasser, or one to whom this duty is not owed, and the company, a different question is presented, and the company can only be made liable when authority, express or implied, to do the act is shown. Thus, the conductor of a train being in charge of, and having full control over it, represents the company as to any matter connected with its management or control, and for an act done by him in the line of his duty, as by the ejection of a trespasser *etc.*, the company would unquestionably be liable ; but for the act of a brakeman of the train, who, without the direction of the conductor, should remove a trespasser from the train, the company would not be liable, unless express authority to do an act to which the act complained of is incident is shown, because the act is not one which comes within the scope of his duty. " Angell & Ames, Corp. § 388, after stating that " an action of trespass can not be sustained against a private corporation for an act done by one of its agents unless done *communicato consilio ;* or, in other words, unless the act has been directed, suffered or ratified by the corporation. A corporation is liable for an injury done by one of its servants in the same manner and to the same extent only as a natural individual would be under like circumstances," adds, " A distinction exists as to the liability of a corporation for the willful toil of its servants, towards one to whom the corporation owes no duty except such as each citizen owes to every other, and that towards one who has entered into some peculiar contract with the corporation, by which his duty is increased. Thus, it has been held that a railroad corporation is liable for the willful

tort of its servant whereby a passenger on the train is injured." 1 Shear. & Red. Neg., § 154.

In *New* v. *Co.*, 17 N. Y. 365, the opinion pointedly draws the distinction, and also *R. R. Co.* v. *Finney*, 10 Wis. 388. In *Godard* v. *R. R. Co.*, 57 Me. 213, the defendant contended that it was not liable because the brakeman's assault upon the passenger was willful and malicious, and not directly or impliedly authorized by the company, and the court said: "The fallacy of this argument, when applied to common carriers of passengers, consists in not discriminating between the obligatiion which he is under to his passenger and the duty which he owes a stranger. It may be true that if the carrier's servant willfully and maliciously assaults a stranger, the master will not be liable; but the law is otherwise when he assaults one of his master's passengers. The carrier's obligation is to carry his passenger safely and properly, and to treat him respectfully, and if he entrusts the performance of his duty to servants, the law holds him responsible for the manner in which they execute their trust."

The Supreme Court of Louisiana drew this distinction so definitely, that when a party was beaten by a porter on a sleeping car, the Pullman Car Co. was held not liable because the act was not in the line of the porter's duty and the person injured had not a berth on the sleeping car, and there was no contractual relation between him and the company, but he had gone into the car to ask privilege to wash his hands; but it held the railroad company liable because he was a passenger and this car was one of its train. *Williams* v. *Car Co.*, and *Same* v. *Same*, 40 La. 87, 417; 8 Am. St. Rep. 512, 538. See extended note to *Ware* v. *Co.*, 35 Amer. Dec. 192; *Dillangham* v. *Russell*, 73 Tex. 47; 15 Am. St. Rep. 753.

The general rule of master and servant is, that the master is liable for the act of the servant, though willful and malicious, if done in the course of his employment within the scope of his authority. Had this unfortunate little boy been a passenger, the company would be liable for the act, for reasons above stated, no matter whether the act was within the scope of the servant's authority or not; but not

being a passenger, but a trespasser, having no contract with the company authorizing him to be where he was and binding the company for safe carriage and proper treatment, he falls under the above general rule.

Outside of the exception as to passengers, the employes of a railroad company may be divided into two classes. For the willful wrongs of one class, though done to even a trespasser, the company is liable, because the act is done in the course of their employment, and within the scope of their authority; whereas for the same act done by a servant falling within the other class it would not be liable. A company might be held liable for a trespass by a conductor to a trespasser on his train, but not for the same act of and by a clerk in the business office or one of a body of repair hands.

Now, there is no question with us that though this little boy was on the car without right, if he was forced or kicked off by an employe of the company, acting in the act in the course of his business and within his authority, that the company would be liable; for though a trespasser, he had not forfeited life or limb, and had the right due to one human being from another, the right of exemption from brutal inhumanity, and not to have his hand while holding to the car kicked loose when the cars were moving, to the almost certain loss of life or limb.

Thus, then, it being the law that for this willful trespass the defendant would only ·be liable, if the employe in doing the act was acting in the course of his business within the scope of his authority, look at answer to interrogatory 5, and it tells us that both the name and the *business* of the man who did this act were unknown. If, as several answers of the jury say, the man's name was unknown, it seems difficult to say how it could be known that he was a company employe except from some evidence tending to show he had on blue clothes; but passing that, still as his business is unknown, how could the jury say that he was acting in the course of that business and within the scope of the authority conferred upon him, when that authority was unknown ? Thus we have the certificate of the jury that a vital element necessary to the plaintiff's case was wanting; this certificate shows that the general verdict

ought not to have been found, because an indispensable element to sustain it was wanting.

What, then, is the effect of this answer 5 ? Section 5, chapter 131, Code 1887, says, that "where any such separate verdict or special finding shall be inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly."

Before this statute allowing special questions to a jury, the essential matters of fact involved in a trial were wrapped up in the general verdict, and it could not be told whether each and all those essential facts were in fact, in the opinion of the jury, found for the party prevailing ; and as the province of a court to set aside the verdict was narrow, the losing party could not have the benefit of a fact which the jury, had they passed separately on it, would have found for him. The Kansas Court said : "The main object of special questions is to bring out the various facts separately, in order to enable the court to apply the law correctly, and guard against any misapplication of the law by the jury. It is a matter of common knowledge that a jury, influenced by a general feeling that one side ought to recover, will bring in a verdict accordingly, when at the same time it will find a certain fact to have been proved, which in law is an insuperable barrier to a recovery in accord with the general verdict. This does not imply intentional dishonesty of the jury, or a failure of the court to instruct correctly, but rather a disposition to jump at results on a general theory of right and wrong, instead of patiently grasping, arranging and considering details. Scarcely any jury will, when questioned as to a single separate fact, respond that it exists, without some sufficient evidence of its existence. Its response will as a rule be correct, if direct, and if not correct, then evasive and equivocal." This statute I regard as a salutary instrument to enable the parties to have the jury as the triers of the facts under the evidence, to say what is their finding separately upon the controlling facts in the case. This statute, originating in New York in 1848, prevails in many western States, all having the clause quoted above from our Code.

In 2 Thomp. Trials it is stated that if such special findings are inconsistent with the general verdict, the latter

falls and they control, and that the judgment must be based on them.   Such, indeed, is the command of our statute, and in *Kerr* v. *Lansford*, 31 W. Va. 663, and *Bridge Co.* v. *Bridge Co.*, 34 *Id.* 155, that construction is put upon our statute.   "When a fact found in one or more of the answers to interrogatories excludes every conclusion that will authorize a recovery for the plaintiff," it is inconsistent. (Thomp. Trial § 2691.)   Clearly answer to interrogatory 5 is inconsistent with the general verdict, for that says that a fact indispensable to recovery could not be ascertained. The plaintiff had to prove to recover that the wrong was done not simply by an employe, but by one in the course of his appointed business and acting within the bounds of his authority in the act in question.

A question arises whether the obscurity and uncertainty as to the author of the wrong, if done, and his business relation to the company is relieved by question No. 6 and its answer.   The evidence tends to show that on the train were an engineer, fireman and two brakemen, one of them being *ex officio* conductor, and a yard master and assistant are suggested as perhaps the persons.   Which one did it we are not told.   The act would not fall within the authority of all, so far as appears.   Then again what does the word "control" in the question mean?   Does it only mean that the person was some one working on the train and therefore in control of it, or in the yard and therefore in control?   If it is to be held as meaning a person in a particular line of duty, that line within which the act of expelling trespassers would fall—then it would seem inconsistent with answer five, which tells us that the business of the man who did it was unknown.   I do not so construe it, but as simply meaning somebody connected with the railroad.

Plaintiff's instruction No. 1.   "The jury are instructed that the defendant is liable for an injury brought about by the negligence or misconduct of its agents and employes acting within the scope of their employment, whether such negligence or misconduct is willful and intentional, or not willful and intentional."

Plaintiff's instruction No. 2.   "The jury are instructed that if from all the facts and circumstances in this case, they be-

lieve that the plaintiff, James Walter Bess, was by threats or violence or by force driven from the train in question when said train was moving, by some employe of the defendant, acting within the scope of his employment, that then the plaintiff is not required to prove the name or establish the identity of the employe."

These two instructions are good with the construction that the alleged wrongful act was one legitimately falling within the scope of the employment of the employe who did the act, if any one did it; and that whilst it is not required to prove the name and identity of the person, yet he must be an employe and his business relation to the company must be ascertained so that it may be determined whether the act was within the scope of his business.

Judge Lucas is of opinion that answer to question No. six relieves the uncertainty of answer to question No. five, and would affirm the judgment, while the other three members of the court would reverse it. Judge English and I would render judgment for the defendant because of the inconsistency of the answer to special question five with the general verdict; but Judges Lucas and Holt would remand the cause for a new trial.

Therefore, the judgment is reversed, the verdict and the six findings in answer to the six particular questions are set aside, and the cause is remanded to the Circuit Court for a new trial.

Reversed.    Remanded.