# CHARLESTON.

## GROBE *v.* ROUP *et al.*

Submitted January 20, 1899—Decided April 22, 1899.

1. INJUNCTION—*Affidavits—Dissolution.*

    It is error to dissolve an injunction on affidavits merely when by the pleadings the burden of proof is on the defendant moving such dissolution, as the plaintiff has the right to cross-examine defendant's witnesses and rebut their testimony. (p. 490).

2. EQUITY PLEADING—*Answer—Cross-Bill—Parties—Process.*

    An answer in the nature of a cross-bill praying the affirmative relief, which affects co-defendants, must make such co-defendants parties thereto, and, in default of the waiver thereof by such co-defendants, must have proper process issued thereon before a hearing can be had as to the matters contained in such answer. (p. 491.)

Appeal from Circuit Court, Cabell County.

Suit by John T. Grobe against C. W. Roup and others. From a judgment dismissing the bill as to Roup and the Pomeroy National Bank, plaintiff appeals.

*Reversed.*

CAMPBELL, HOLT & CAMPBELL, for appellant. ·

SIMMS & ENSLOW and C. E. HOGG, for appellees.

DENT, PRESIDENT:

This is a controversy over one thousand eight hundred dollars of funds belonging to the firm of Grobe & Roup, now on deposit in the Huntington National Bank.

It was here once before. See *Grobe* v. *Roup*, 44 W. Va. 197, (28 S. E. 699), where the facts are fully set out. It was then held by this Court that, as the papers then stood, the plaintiff, John T. Grobe, had made out a *prima facie* case, and that the injunction should be continued until the final hearing thereof. On the case being remanded the Huntington National Bank filed its answer, admitting substantially all the charges of the bill, except that it denied having any knowledge of the fraudulent intent of the partner, Roup, in transferring the fund to his individual credit and taking a certificate of deposit therefor in his own name, claimed it was an innocent holder of the fund, and prayed that the court would decree as to who was the proper party entitled to the fund, —the partnership and its creditors, or the Pomeroy National Bank, the holder of the certificate. The respondent, then, without waiting for a final hearing of the cause, filed the affidavits of its officials as to want of notice of the firm's equities, or the fraudulent intent of the partner in procuring its certificate, and moved a dissolution of the injunction. The plaintiff replied generally to such answer, and filed his own affidavit in contradiction of that of J. K. Oney, cashier of the respondent, and resisted such motion. The Circuit Court sustained the motion and dissolved the injunction, and dismissed the bill as to respondent and the Pomeroy National Bank. From this decree the plaintiff again appeals.

In the case of *Schoonover* v. *Bright*, 24 W. Va. 698, it is held that "an injunction will be dissolved on the hearing if the answer fully, plainly and positively denies all the material allegations of the bill on which the injunction was founded, and there is no proof to establish allegations." *Hazlett* v. *McMillan*, 11 W. Va. 466. *Petroleum Co.* v. *Rittenhouse*, 12 W. Va. 313. This is a good law, but it is inapplicable to this case. Plaintiff's bill set up a good case of fraud, and the circumstances surrounding it raised a *prima facie* notice thereof against the Huntington National Bank. Without repelling any of these circumstances, the bank denies notice. This casts the burden of proof upon it. "The fact of notice may be inferred from circumstances as well as provided by direct evidence, and, where the facts and circumstances are such as to raise a presumption of notice, the burden of proof

is shifted, and it devolves upon the defendant purchaser to prove want of notice. *Newman* v. *Chapman*, 2 Rand. (Va.) 93; *French* v. *Loyal Co.*, 5 Leigh, 635; 16 Am. Eng. Enc. Law, 790." *Farley* v. *Bateman*, 40 W. Va. 540, (22 S. E. 72). This rule applies especially in cases of fraud depending for proof upon the facts and circumstances. The burden being shifted to the bank to prove want of notice, it cannot do this by mere affidavits of witnesses, for the reason, if no other, that plaintiff has the right to cross-examine them. In addition, the respondent's only material witness to establish want of notice (the cashier) is contradicted by the plaintiff's affidavit, which leaves the facts and circumstances to control, which, as heretofore held by this Court, are sufficient to establish a *prima facie* case in favor of plaintiff. It was therefore error to dissolve the injunction until a full, fair hearing of the case on proofs could be had. *Noyes* v. *Vickers*, 39 W. Va. 30, (19 S. E. 429); *Vreeland* v. *Stone Co.*, 25 N. J. Eq. 140; *Wooton* v. *Smith*, 27 Ga. 216; *Armstrong* v. *Town of Grafton*, 23 W. Va. 50, 55; *Kerr* v. *Hill*, 27 W. Va. 576, 605. If the defendant admits the equity in the bill, but sets up new matter of defense, on which he relies, the injunction will be continued till the hearing. 2 Tuck. Bl. Comm. 478. The proof of want of notice, in the light of the circumstances, is matter of defense, shifting the burden, as held in the former decision of this Court, to the respondent.

There is another matter in the way of the dissolution of this injunction. The Huntington National Bank still has the partnership fund under its control, and it now has full and complete notice not to pay it out to the delinquent partner or his order. In its answer it has presented no good reason why it should be permitted to do so in fraud of the partnership. It does not claim that it is liable now, or ever will be, to pay such fund to any one else. It says its certificate of deposit is held in the Pomeroy National Bank, and submits to the court the question of its negotiability, and apparently prays affirmative relief in relation thereto, in asking the court to determine to whom the funds should be paid, and for further and general relief. This answer is undoubtedly a bill of interpleader, in the nature of a cross bill. But it makes no parties, and is therefore fatally defective in this respect.

On such an answer the court could decree no relief against the Pomeroy National Bank, for the reason it is not properly impeated. *Goff* v. *Price*, 42 W. Va. 384, (26 S. E. 287.) In this case it is held that "an answer under secton 35, chapter 125, Code, containing new matter constituting a claim for affirmative relief, may be taken for confessed as against the plaintiff, but not against another defendant, without service of process." It would be improper to decide upon the negotiability of the certificate of deposit, especially as against the Pomeroy National Bank, unless it was so impleaded that it would be bound thereby, either as to such negotiability, or other equities that may arise between the two banks, and in which the plaintiff is not otherwise than incidentally interested. On the question of the negotiability of such certificates, as it must inevitably arise, counsel are referred to 5 Am. & Eng. Enc. Law (2d Ed.) 809. The decisions are collected on page 805. See especially the Alabama and Pennsylvania doctrine. *Patterson* v. *Poindexter*, 6 Watts & S. 227; *Davis* v. *Miller*, 14 Grat. 1, 18; *Bank* v. *Hysell*, 22 W. Va. 142, 146; *O'Neill* v. *Bradford*, 1 Pin. 390, 42 Am. Dec. 574, note. For the foregoing reasons, the decree complained of is reversed, and the cause remanded for further proceedings in accordance with the principles of equity.

*Reversed.*

# CHARLESTON.

LANDERS *v.* OHIO RIVER R. CO.

BRANNON AND ENGLISH, JUDGES, *dissenting.*

Submitted January 16, 1899—Decided April 22, 1899.

SYLLABUS BY THE COURT.

APPEAL—*Argument of Counsel—Instructions.*

In order to authorize this court to revise errors predicated upon the abuse of counsel of the privilege of argument, it should be made to appear that the party asked and was refused an instruction to the jury to disregard the unauthorized statements of the counsel.    (p. 502).

Error to Circuit Court, Mason County.

Action by John Landers, by his next friend, William H. Landers, against the Ohio River Railroad Company. Judgment for plaintiff, and defendant brings error.

*Affirmed by divided Court.*

Rankin Wiley, H. P. Camden, and Chilton, MacCorkle & Chilton, for plaintiff in error.

RUSSELL & WEBSTER and C. E. HOGG, for defendant in error.

McWHORTER, JUDGE:

This was an action for damages for personal injuries to John Landers, an infant, who sued in the Circuit Court of Mason County by William H. Landers, his next friend, against the Ohio River Railroad Company, in which he laid his damages at twenty thousand dollars. The case was tried at a special term of said court, held in November, 1895, and a verdict was rendered for plaintiff for eight hundred dollars, upon which judgment was rendered on the 7th day of December, 1895. The declaration contained four counts, to which, and to each count, defendant demurred. which demurrers the court overruled, and which overruling is assigned by the appellant as error; but, as counsel for appellant points out no ground for sustaining it,

and does not rely upon it in his brief, and as the declaration seems to be in good form, following in a general way, and as nearly as may be, Hogg, Pl. & Forms, pp. 344-346, and I think sufficiently alleging good cause of action, I see no reasons for disturbing the action of the court in overrulling the demurrer.

It appears from the record that on the evening of July 17, 1893, at the town of Point Pleasant, in said county, a through freight train of the defendant, containing about 27 cars, came into the yard from the southward, remaining a few moments, or a short time, and, as it pulled out on its regular run going north from the station, the plaintiff, a boy or young man of about 17 years of age, who lived with his father, near Pomeroy, Ohio, a few miles above Point Pleasant, and who, in company with a young man, Charles Sanley, had walked down to the latter town that day "in search of work," and failing to find it, and desiring to return home, having no money to pay his fare, climbed on the train, and stood on the ladder between the cars. Some eighteen or twenty others got on at the same time. Plaintiff testifies: That he was standing alone between the cars. "There was a fellow standing there talking to the conductor, and he was standing there talking to him, and I seen him [the conductor] talking and pointin at me," and the fellow who was talking to the conductor "came right there to me, and kicked me off the train." That the conductor, when pointing towards plaintiff, said something; but plaintiff could not tell what it was on account of the train making so much racket. Says he kicked him in the back, between the shoulders, and that he fell on the side next the river, and, when he went to get up, saw there was something wrong with his left ankle, tried to get up, and could not. Some fellows came and "packed" him up by the flour mill. Did not know who picked him up. Two doctors came, and pulled around on his foot, and got it to the place as near as they could, bandaged it up, and gave him some medicine to put on it, and Robert Johnson took him to his home, and kept him over night. The next day was sent up on a boat to Enterprise, and hauled home in an express from there. That after he got home Dr. Shafer treated him, made two visits, dressed his ankle, put salve on it, and bandaged

it up again; left salve, and directions how to treat it; put it on a pillow on a chair. Was in the house over three weeks, and over five weeks before he could walk without a crutch; then used a cane. Suffered greatly. Said it pained him very much in cloudy weather, and hurt him so he could not sleep of nights much, and kept a good strong bandage on it all the time. Could not get around as well as before he was hurt. Could not wear boots, nor lace-shoe tight, but had to keep it loose. Says, when the man came to him, he was doing nothing but standing and riding on the train, and he said to him, "You get off of here, you d— s— of a b—," and whaled away, and kicked him off; that the train was running at right good speed. Dr. E. J. Mossman was called to him, with Dr. Neale. Mossman testifies that they found the large bone broken, and a fracture and dislocation of the ankle joint. The smaller bone on the outer side was driven down over the bones of the ankle; in other words, there seemed to be a jamming of the bones of the ankle joint up between the other two,—the bones of the leg. The ligaments were very much torn by reason of this fracture,—by reason of this break,—and even when he saw it there was considerable swelling. Dr. Mossman was corroborated by Dr. Neale, both of whom testified as to the condition of the injury at the time of the trial, as did also Dr. L. V. Guthrie, showing that it was still a severe injury, giving more or less trouble, and that it was a permanent injury. Several other physicians also testified as to the condition of the injury at the time of the trial, corroborating the testimony as to the permanency of the injury, and the effect of it in the future of his life. The question is as to the liability of the defendant, and the correctness of the rulings of the court, and whether there is evidence tending to support the verdict of the jury. If the liability is established, the judgment is reasonable enough, and is not complained of as to amount.

Witness William Orr was asked if he saw John Landers on the train that started north that evening, and says: "No; I didn't see him on the train. I saw him when he struck the ground. I saw him when he got off the train. * * * State what took place; what, if anything, you heard Mr. Murray, the conductor, say upon that occasion. Well, when I saw the train there, I went to get on the train

to go to Mason City, and Mr. Murray hallooed to get off
there. I got off. He said, 'Kick them s—s of b—s off,
I don't know who he meant. He didn't mean me, for I
was already off. I looked up the track there, and I seen
this man coming out. I seen him coming out tumbling
over, it looked like to me.' I run to him,"—and states:
After the command was given, he saw a man he thought
was a brakeman, who had been helping to do the work in
the yard, come up, and it looked to him like he got his foot·
down this way, and kicked. Saw his foot go through the·
car. The man was on the car right above the man who·
tumbled out. Witness was on the ground about two car
lengths from Murray when he made the remark. Wit-
ness thinks he saw the man who did the kicking going·
south that morning, but may be mistaken. Saw him come·
in on the train from the south, and, after he did the kick-
ing, saw him going north on the train. Thinks the train
was moving six or eight miles an hour. Two others jumped
off when witness did, when Murray "hallooed" to get off.
Ed. Wright, witness, was firing at Equity Mill. Was
standing in the engine room at the mill, and saw a man
coming from the engine to the rear of the train. He stepped
across to the coupling of the cars. Didn't see the man that
he kicked. He took hold of the brake with his left hand,
and reached back, and kicked, and saw the boy come out,
and he came out like a bird, too. It was the plaintiff.
After filling the furnace, went to the boy, who was lying
there, holding his leg up with his hand. Train was going·
six to eight miles an hour. Robert Adkins saw the train
going up; saw a couple of fellows on the train; did not
know exactly, at the time, that one of them was John
Landers; was standing within about 15 feet of Murray,
who was talking to a fellow, with light clothes on, on the·
train, on an oil tank, and the fellow stepped off from him,
about two or three steps, and he pointed out towards.
this fellow, whose head and neck was sticking over the·
box car, and he halloed out, and said, "Kick that G—
d— s— of a b— off there." When Murray gave the order,
he ran out on the cars, and kicked this fellow off. John
Eads says William Murray was conductor on the train.
Witness was standing on the ground, could not tell how
close to the car on which the conductor was, but in hear-·

ing distance, and heard the conductor say to the fellow with light clothes on, "Kick that s— of a b— off between the cars." The man went between the cars, and John Landers came out on the side towards witness. When the train passed, witness went to him. A crowd gathered around him. Drs. Mossman and Neale came and examined his leg.

William Murray, who is admitted and proved by both parties to have been conductor of the train, is introduced by appellant as a witness, and denies that he gave orders to kick plaintiff off the train, or to put any person off, or that he made any such remark as is attributed to him by several of appellee's witnesses, who claim to have been near to him, and heard him direct that they be kicked off, and says he knew nothing of any person being put off the train in the yards at Point Pleasant, or above the yards, until he got to Camden, some miles above. James Sharpneck says he was front brakeman on the train; that the train was moving six or eight miles an hour; that he kicked no person off, and did not tell any one to put any body off. J. R. Cawley was brakeman on rear of the train, and heard Conductor Murray, while standing on the ground, tell some fellows, while pulling out of the side track, that he wanted them hobos to stay off the train, or keep off, or something of that kind. The witness was also standing on the ground and heard him "halloo." This was while they were making up the train. That witness did not kick anybody off, nor put anybody off the train, nor direct anybody else to put off or kick off anybody, but knew nothing about it until, three or four days afterwards, he heard in Parkersburg that some fellow was hurt. William Grass, witness for appellant, was allowed by the conductor to go on the train from the yards at Huntington, and assisted the brakeman, for being carried up to Marietta. Says he ordered the men off, but used no means to put them off, and they jumped off at their own accord; that he had no authority to put them off; that the conductor did not authorize him to do so; that, when the men jumped off, he was within about three feet of them. Witness was on top of the car, and they were between the two on the deadwood. Says that man did not get off in the right way, as he ought. He stood on the deadwood, and just jumped off. He didn't catch hold of the

handhold or footholds, but just jumped off. The defendant also introduced Val. Barrick, who states: That he was yard master at Point Pleasant. That he had, under the rules of the company, control of all trains while in the yard. That he had charge of that train until it left the yard. That, when it started, he was standing at the penstock talking with William Murray, the conductor. That Murray climbed up the ladder, got onto the box car next to the engine, gave the engineer a signal to call for a signal from the rear end of the train. That the yard limits are a half mile north of where appellee was hurt. Saw Landers when he came out from between the cars. Saw a man on top of the cars above him. The man above him was not in the employ of the company. That a train like that would make a very loud noise, so it would be almost impossible to hear anything around close to where it was. Heard Murray say to a crowd of fellows walking over from the river bank, leisurely along, "You hobos want to stay off that train to-night," and they turned and walked back towards the river. As soon as the engineer got on his engine and whistled for brakes, and started the train, Murray ran to catch this box car. That he got on, and the fellows that he told not to, turned around, and made a rush for the train, and by the time he got to the train, the train was half gone by, and they commenced grabbing for handholds, and some grabbed them, and they couldn't make it. They would let go, and run back, and try it again, before they got to the pen stock. Witness says he had control of the train as yard master while it was in the yard. The condutor had control after it started.

The court, on motion of the plaintiff, gave to the jury the following instructions, designated below as 1, 2, 3, and 4, contained in bills of exceptions Nos. 2, 3, 4, and 5, and the giving of which, being objected to by the defendant, constitute assignments of error Nos. 3, 4, 5, and 6, respectively: "(1) The jury are hereby instructed that if they believe, from the evidence, that the plaintiff, John Landers, got aboard of one of the Ohio River Railroad Company's north-bound freight trains in the month of July, 1893, without any right or permission to do so from the defendant, or any of its employes, and was a trespasser thereon; and if they further believe, from the evidence, that while

the said Landers was on the said train he was kicked or
forced therefrom by an order or command given by the con-
ductor on said train, and while said train was in motion,
and moving at a rate of speed rendering it unsafe or dan-
gerous to eject the said Landers by force or violence there-
from; and if they further believe that said Landers was
ejected by force or violence from said train by the order or
command of the conductor thereof, and that, in conse-
quence of being so ejected from said train, said Landers
sustained any physical injuries,—then the jury should find
for the plaintiff, and assess his damages at such sum as
will be commensurate with such injuries, not exceeding,
however, the sum sued for in this action.   (2) The jury
are further instructed that, in the absence of proof to the
contrary, the power or authority to eject any and all tres-
passers from the freight train  upon which the plaintiff,
Landers, was attempting to ride, after the train had been
signaled to leave the yards at Point Pleasant by the con-
ductor, and was in motion, and going north on the main
track on its regular trip, and upon which such conductor
had taken his position, belonged to the conductor thereof,
as such conductor could not exercise this power or author-
ity so as needlessly or wantonly to cause injury to another,
even to a trespasser on his train; and if the jury believe,
from the evidence, that such conductor did exercise such
power or authority by commanding or ordering said Lan-
ders to be kicked or forced from said train while the said
train was going at such a rate of speed as to make it un-
safe or dangerous to life or limb to thus eject said Landers
from the said train, and if the jury further believe, from
the evidence, that said Landers was so forced or ejected
from said train, and thereby and in consequence thereof
sustained personal and physical injury, the jury are author-
ized, under such circumstances, to find a verdict for the
plaintiff, and to assess his damages at such a sum as the
evidence may justify, not exceeding the sum claimed in the
declaration.   (3) The jury are further instructed that
in this State, when a railroad train is running on the main
line of its road in the course of its regular run, and is
manned by a conductor, engineer, fireman, and brakeman,
like the one shown in the evidence here, in the absence of
proof to the contrary, all power to eject rests impliedly,

under the law, with the conductor, and such power must be exercised either by such conductor or some one else acting under or by his order or command. (4) The jury are instructed that the special instruction offered in evidence, reading as follows: 'Agents and yard masters will have charge of and direct movements of all trains and trainmen in Parkersburg, Point Pleasant, Guyandotte, and Huntington yards,'—does not take away the power and authority implied, possessed under the law by the conductor of a through freight train to protect and care for his own train, while the same may have been on the main line of the railroad; and if the jury believe, from the evidence, that the same was running on the main track, going on its regular run north, with the conductor and the rest of the crew aboard, after the yard master had signaled the conductor to leave, then such conductor, after his train had started and was moving on the main line on its through run (although it may have been at the time within the yard limits of the railroad company), had the authority to order a trespasser from his train; and if the jury believe, from the evidence, that said conductor ordered the plaintiff ejected from his said train under such circumstances, then such conductor was acting in the line of his duty, and within the scope of his duty, and within the scope of his implied powers, in the absence of evidence conferring such authority upon some one else then on the train."

That appellee was a trespasser on the train is admitted, and the conductor of the train had the right to eject him therefrom, no more force being used than necessary, and, though injury result to him from a lawful ejection, it is not a ground of action. *Grogan* v. *Railway Co.*, 39 W. Va. 415, (19 S. E. 563). "Nevertheless, although the person injured be a tresspasser, the railway will be liable to him if its servants, in the exercise of authority delegated to them, expel him with unnecessary violence." Patt. Ry. Acc. Law, 189. Appellant insists that instruction No. 1 is erroneous "because it predicates recovery upon the fact that the train was moving at a rate of speed rendering it unsafe and dangerous to eject the plaintiff when the command was given, and not when he was kicked off." A careful reading of said instruction will

show that it is not susceptible of such construction. "If they further believe, from the evidence, that while the said Landers was on the said train he was kicked or forced therefrom by an order or command given by the conductor on said train, while said train was in motion," etc. The word "and" refers back to the manner of executing the command, and not to the command. If the word "and" had been left out, it might be construed to mean that the command was given while the train was in motion; but it would be a total perversion of the meaning of the instruction, and the jury would never think of applying such a meaning. Appellant says it is bad "because it tells the jury that if they believe, from the evidence, that Landers was ejected by force or violence from the train by the order or command of the conductor thereof, and that, in consequence of his being so ejected, he sustained injury, the company is liable." This objection might apply if the train were standing, but if he was so ejected when the train was in motion, at a rate of speed rendering it unsafe or dangerous to eject him by force or violence therefrom, the objection does not apply. Further, he says it is bad "because there is no evidence to support the hypothesis that it was moving at a speed rendering it unsafe and dangerous to eject a trespasser." That is a question for the minds of the jury. The evidence of quite all the witnesses on both sides is that the train was moving about six to eight miles an hour. One of appellant's witnesses put it at five or six miles an hour. Appellant says: "The company is not liable unless the force used was excessive, resulting in unnecessary injury as a natural consequence, or was applied at a time and under circumstances as to make unnecessary injury a natural consequence; and this instruction does not predicate liability upon either of these elements, but upon force, resulting in injury, alone." Patt. Ry. Acc. Law, 190, speaking of injury to trespassers: "If his injuries are the result of the violence with which the railway's servants have expelled him from the railway's cars or premises, or if those injuries were caused by the circumstances under which he was expelled, as, for instance, from a train in motion, then the railway is liable to him therefor,"—provided, of course, that the servant was

acting in the exercise of authority delegated to him by the railway.

Objection is made to instruction No 2 "because the word 'needlessly' is indefinite, uncertain, and misleading, for its meaning in this connection cannot be fixed and determined," and that it says that if "Landers was so forced or ejected from said train"; the word "so" being intended to refer to what precedes, but that "so ejected," in the connection in which it is used, might mean that he was ejected by force, but not while the train was going at a dangerous speed, and not by the command of the conductor. The evidence is conflicting in many respects, but all the witnesses agree that this man left the train while it was in motion at a rate of not less than five to six miles an hour, and only one witness mentions a rate that low, while all the others put it at six to eight miles, and the jury were the judges whether the rate was such as to make his ejection unsafe or dangerous and the instruction could not mislead. Instruction No. 3 is objected to by appellant because "it tells the jury that the power to eject rests with the conductor, and if any one is ejected, the conductor must have done it, because he has the power." While this instruction might have been constructed differently, to bring out a little more clearly than was intended by the court,—i. e. that in order to make the appellant liable the power must have been exercised either by the conductor, who had the authority, or by his direction,—this is all it could mean, taken as it stands, and, taken in connection with the other instructions given for plaintiff, the jury could not be misled by it. It is not inconsistent with the other instructions, or any of them.

Instruction No. 4, the subject of bill of exception No. 5, and the assignment No. 6, is so manifestly proper, and the appellant not attempting to state any grounds of objection, I deem it unnecessary to discuss it further than to say that the rule of appellant set out in the instruction, in relation to the control of trains, in directing their movements while in the yard, by agents and yard masters, only refers to the yard movements of the train, in switching, arranging, and adjusting the cars, in making up or changing the train, and cannot relate to the protection of the train against intruders and trespassers on the train

when moving on the main track, and on its regular run, and after it has been signaled by the yard master to leave, although the train may yet be within the yard limits, which in this case appear to extend a half mile or more north of the starting point.

The seventh assignment, that the court erred in overruling defendant's objections to certain testimony, set out in bills of exceptions Nos. 7 to 12, inclusive, and which was permitted to go to the jury,—such testimony being that of physicians, as experts, touching the permanency and effects of the injuries to plaintiff,—is not relied upon by appellant in the argument.

Neither do counsel rely upon the eighth assignment, set out in bills of exception Nos. 13, 14, and 15, where the court sustains plaintiff's objections to certain questions asked of witnesses by appellant; and I fail to see how either the appellant was injured by the admission of the testimony objected to by appellant, or could have been benefited by the admission of that offered by it and rejected, or that it was injured by its rejection.

The ninth assignment is that court erred in permitting counsel for plaintiff, in their argument before the jury, to use the language set forth in bills of exception Nos. 16 and 17, and apply the same to defendant and defendant's witnesses. The language complained of in bill No. 16 is as follows: "A railroad is an artificial being, without life, without soul, as cold as iron, as heartless as marble; that it had no wife, no child, no life; that its management, through its agents, was as devilish as it could be." And that set forth in bill No. 17 as follows: "During these hard times, when employment was scarce, when railroad men are plenty, when there are those in good employment, it is a great incentive, if they have committed a wrong, to try to help it out, and cover it up, so the road will not be liable to discharge them. Every inducement, in trying to get them to misrepresent the facts, if there is a wrong committed, and make the railroad free from damages, is used that can be mustered up within the human breast." In *Young* v. *State*, 19 Tex. App. 536 (Syl., point 2): "In order to authorize this court to revise errors predicated upon the abuse of counsel of the privilege of argument, it should be made to appear that the accused re-

quested, and was refused, an instruction to the jury to disregard the unauthorized statements of the counsel." In discussing the matter, the court say: "Counsel for defendant excepted to said remarks, and did nothing more;" that counsel should have requested the court to instruct the jury that they should not be influenced by the remarks so objected to. Court further say, if such instruction had been asked and refused, the error would have been sufficient to reverse the judgment, but this was not done; and this was a case in which the affirmance of the judgment remanded the appellant to his death. In *Vannatta* v. *Duffy*, 4 Ind. App. 168, 30 N. E. 807, the court hold that: "In order to save the question of alleged misconduct on the part of counsel in making the argument to the jury, an objection should have been made, and a ruling insisted upon, that the remarks were improper, and that they should be withdrawn by counsel and disregarded by the jury, and, failing to obtain a favorable ruling, an exception should have been taken to the action of the court. After this, still other remedies were available. The party could have moved to set aside the submission, and discharge the jury, or he could have asked the court to give a special instruction upon the subject of the counsel's objectionable remarks." In *State* v. *Hull*, 18 R. I. 207, Syl. (s. c. 26 Atl. 191): "At the trial the attorney general stated to the jury that it was the privilege of the defendant to testify or not, and then strongly commented on the defendant's ommisson to testify or to adduce evidence. The court condemns the conduct of the attorney general, but, as the record showed no request made by the defendant for instructions to the jury to disregard the attorney general's statements, decline to consider such conduct as a reason for a new trial. If the appellant desired the full benefit of his exception to the language used, it was his duty to insist that the same should be withdrawn from the jury, or have the court instruct the jury to disregard it, and, upon refusal of the court to so instruct, to except to the ruling of the court, or to move to set aside the submission and discharge the jury, because they were prejudiced against the appellant by said language; and the defendant, having "made no motion to arrest the trial on that score." *State* v. *Chisnell*, 36 W. Va. 670, (15 S. E. 415), but pro-

ceeded with the trial "without objection, will not after-
wards be heard to object that the trial was vitiated there-
by." While I do not think the language complained of
is sufficient ground for a new trial, even if appellant had
taken all the necessary steps to have the full benefit of
his objections, yet, as the matter comes up on the record,
and is urged as ground for a reversal of the judgment
and granting a new trial, I deem it proper for this court to
express, as it has on former occasions, disapprobation of
that style of argument before a jury.

The case of *Bess* v. *Railway Co.*, 35 W. Va. 492, (14
S. E. 234), is confidently cited by appellant as being con-
clusive of this case in its favor. The cases are similar,
in that the plaintiff was a trespasser, and he was ejected
from the train by some one on the train when it was in mo-
tion, and injured; but in that case, under section 5, chap-
ter 31, of the Code, the jury were required to find, in addi-
tion to their general verdict, upon certain particular ques-
tions of fact submitted to them, and under the provis-
ions of said section, "where any such separate verdict or
special finding shall be inconsistent with the general ver-
dict the former shall control the latter, and the court shall
give judgment accordingly." In the Case of Bess the special
ial finding was ascertained by this court to be inconsistent
with the general verdict, and therefore a new trial was
awarded under the statute. In the case at bar there was
no special issue, but the case went to the jury on the gen-
eral issue. The evidence was conflicting,—that of the ap-
pellee tending to prove that the ejection was done at the
command and direction of the conductor in charge of the
train, while the evidence on behalf of the appellant was
to the contrary. If the jury believed the evidence on
behalf of the appellee, they could not do otherwise than
find as they did; the jury alone being the judges of the
weight of testimony. In the case of *Bess* v. *Railway Co.*,
*supra* the court quotes with approval 2 Wood, Ry. Law,
316, that "the conductor of a train, being in charge of
and having full control over it, represents the company
as to any matter connected with its management or con-
trol, and for an act done by him in the line of his duty,
as by the ejection of a trespasser, etc., the company
would unquestionably be liable; but for the action of a

brakeman of the train, who, without the direction of the conductor, should remove a trespasser from the train, the company would not be liable, unless express authority to do an act to which the act complained of is incident, is shown, because the act is not one which comes within the scope of his duty." Appellant claims that the man who kicked appellee from the train was not an employe of appellant. The evidence tends to prove that he was on the train by permission of the conductor, assisting at the brakes, and was acting under the immediate direction of the conductor in ejecting appellee from the train.

The second assignment is that the court erred in overruling the appellant's motion to set aside the verdict because it was contrary to the law and the evidence. In *Sheff* v. *City of Huntington*, 16 W. Va. 307, (Syl., point 12): "A new trial, asked on the ground that the verdict is contrary to the evidence, ought to be granted only in a case of plain deviation from right and justice, and not in a doubtful case, merely because the court, if on the jury, would have given a different verdict." Id. (Syl., point 13): "When a case has been fairly submitted to a jury, and a verdict fairly rendered, it ought not to be interfered with by the court, unless manifest wrong and injustice has been done, or unless the verdict is plainly not warranted by the evidence or facts proven." In *State* v. *Hunter*, 37 W. Va. 744, (17 S. E. 307 Syl.): "Where a motion for a new trial is made, on the ground that the verdict is contrary to the evidence, and the motion is denied, the opinion of the court which tried the case is on such point entitled to great respect in the Appellate Court; and the Appellate Court, in such case, will grant such new trial only in the case of a plain deviation from right and justice." The same doctrine is held and discussed by Judge Brannon, in delivering the opinion of the court in *Gilmer* v. *Sidenstricker*, 42 W. Va. 52, (24 S. E. 566), and then again by the same Judge, in *State* v. *Bowyer*, 43 W. Va. 182, (27 S. E. 302): "We have power—mere power—to discredit verdicts; but we must be cautious in so doing. Why have juries, if appellate judges are to go into the business of weighing evidence as if by the ounce and pound? We ought not to do this. It is an abuse of power, and a misconception of our functions and the jury function. The jury institu-

tion is sacred under our constitution, and a verdict is to be
highly respected * * *   And then too, we must not forget
that a learned and experienced judge approved the verdict
after witnessing the trial; and his opinion is entitled to
great respect in an Appellate Court.   We must be care-
ful, lest we set ourselves up as judge and jury, present at
the trial, and usurp their functions."   The judgment should
be affirmed.

### ON REHEARING.

There are only two points mentioned in the petition
for rehearing not before discussed,—one as touching the in-
struction set forth in bill of exceptions No. 3.   Appellant
claims that giving said instruction is reversible error under
a recent decision of this Court, not yet reported (I pre-
sume is meant the case of *State* v. *Staley*, 32 S. E. 198), be-
cause it assumes as true certain material facts stated in the
instruction, "and the law propounded by the instruction is
based upon the assumption of these facts, without leaving
it to the jury to determine whether or not these facts were
proved, or for them to find," and that in said instruction
the following facts were assumed:   "(1) That Landers was
attempting to ride; (2) That the train had been signaled
to leave the yard at Point Pleasant by the conductor;
(3) that the train was in motion, and going north on the
main track on its regular trip; (4) that the conductor had
taken his position upon the train.   These were all facts
upon which there was no conflicting testimony, proved by
all the witnesses who had testified in the case on both
sides, and do not come within the purview of the case
cited, which holds that the court should not assume as
true material facts in issue before the jury, about which
there is conflict of testimony, between which it was the
province of the jury to decide, nor should the court assume
that such facts were not proven, if there was evidence
tending to prove them.

It is also claimed that defendant's instruction referred
to in bill of exceptions No. 6 should have been given, and
it was error to refuse it, as follows:   "The jury are in-
structed that, before exemplary damages can be awarded
plaintiff for an injury, although the injury inflicted be done
wantonly and willfully, the plaintiff must be without fault
on his part,"—and says in its petition for rehearing:   "This

NOTE BY BRANNON, JUDGE:

I decline to impose upon the defendant the large sum of eight hundred dollars for an injury to the plaintiff of which he was the author. He was a trespasser, riding upon the train after having been given notice not to get upon it, and he remained upon it after the conductor had demanded that he get off, which demand he persisted in disregarding. The company owed him no duty, except not to wantonly injure him. The agent of the conductor kicked his hand from the ladder; but what else could he do? He had a right to remove him; and, as the train was yet in the yard, moving only five or six miles an hour, the speed was not dangerous, nor was the force excessive under the circumstances. He was wedged in between the cars. Must the conductor stop the train? He says he could have jumped of with safety. He should and could have done so. I admit the company would be liable for a wrongful removal by the conductor, though I do not regard this removal wrongful. But it was done by an agent selected by the conductor, and he had no authority to select that agent. It is true the evidence tends to show that the conductor directed the act, and it is claimed to be the same as his act; but that is not sufficient to charge the company. The master is liable only when his agent had authority to employ a sub-agent. *Haluptzok* v. *Railroad* Co. (Minn.) 57 N. W. 144 (26 Lawy. Rep. Ann. 739).

JUDGE ENGLISH, voted with me to reverse the judgment. An equally divided court affirms it.