## . CHARLESTON

### LYONS v. FAIRMONT REAL ESTATE CO.

Submitted June 14, 1911.     *Decided October 15, 1912.

(Rehearing Denied March 4, 1913).

1. ACTION—*Pleading—Joinder of Causes—Permanent and Temporary Damages.*
   Claims for permanent and temporary damages to real estate, growing out of the same act, may be united in one action and in a single count of the declaration. (p. 756).

2. PLEADING—*Allegations in General—Surplusage.*
   If the facts stated in such a declaration warrant recovery of temporary, but not permanent, damages, allegations as to the latter are treated as surplusage. (p. 756).

3. TRESPASS—*Damages—Measure.*
   In an action by an owner of land for damages for a trespass, consisting of the building and maintenance of a structure on his land by an owner of adjacent land, only temporary damages are recoverable, and the measure thereof is the rental value of the land together with compensation for loss of crops, trees, shrubbery and the like, and injury to the residue of the lot or tract. (p. 758).

4. SAME.
   In such case, neither the estimated cost of abating or removing the structure nor general depreciation in the value of the property as a whole can be recovered, while the trespasser remains in possession. (p. 758).

5. BOUNDARIES—*Description—Conflicting Elements.*
   If there is inconsistency between the calls in a deed for courses and distances, on the one hand, and, on the other, an artificial monument, or its ascertained location when it has been removed or destroyed, the latter prevails. (p. 766).

---

*Rehearing asked for and refused. Copy was not delivered to Reporter in time to print in regular order.—REPORTER.

6. Evidence—*Materiality.*

Tendency of evidence, in an appreciable degree, to sustain a material issue of fact, makes it admissible and justifies instructions founded upon it. (p. 767).

7. Trespass—*Acts Constituting Burden of Proof.*

One who enters upon the bare possession of another is *prima facie* a trespassed, and, to make good his defense to an action for the trespass, must prove to the satisfaction of the jury by a preponderance of the evidence that he is the true owner. (p. 768).

8. Adverse Possession—*Actual Possession—Necessity for Inclosure.*

The other requisites of the law of title by adverse possession under a claim of title only having been complied with, actual physical enclosure of the land by fence is not necessary, if the claimant has shown his occupancy and claim of title and the limits thereof in some other reasonably certain way, as by clearing and cultivation, or cultivation without clearing, or by some recognized mode of improvement. Nor is it necessary that such cultivation or improvement extend to the line claimed at every point, if the acts done manifest unequivocal intent to claim up to the line. (p. 768).

9. Trespass—*Actions—Form of Remedy.*

An owner of land in actual possession of part thereof may maintain trespass on the case against a trespasser in possession of another part thereof, claiming title to it, and recover such temporary damages as have resulted from the injury done by the entry, occupancy and other wrongful acts. (p. 773).

10. Trial—*Verdict—Interrogatories.*

The trial court may properly refuse interrogatories, asked for under the provisions of section 5 of chapter 131 of the Code, if they are not so framed as to make an answer to one of them or the answers to all of them fatal to a general verdict against the party requesting them, and entitle him to final judgment on the answer or answers, as the case may be, provided the special finding or findings are favorable to him. (p. 774).

11. Same.

Interrogatories, seeking a mere itemization of the damages assessed, on the assumption of an adverse general verdict, or the disclosure of some other fact, inconclusive in character, and which may or may not, according to the answer, give support to a motion for a new trial, are not within the purpose or intent of the statute. (p. 774).

(Robinson and Brannon, Judges, dissenting in part )

71 W. Va.

Error to Circuit Court, Marion County.

Action by Carrie Lyons against the Fairmont Real Estate Company. Judgment for plaintiff, and defendant brings error.

*Reversed and New Trial Ordered.*

*C. M. Alexander* and *Charles Powell,* for plaintiff in error.

*Harry Shaw* and *Tusca Morris,* for defendant in error.

POFFENBARGER, JUDGE:

The third jury trial between the parties to this action, very hotly contested on both sides, resulted in a $1,200.00 verdict for the plaintiff, as damages for injury done by the defendant to her real estate, a small lot in the city of Fairmont, and judgment was rendered on it, after an adverse ruling on a motion to set it aside. Numerous assignments of error are vigorously pressed in this Court.

The declaration was attacked by demurrer and also by motion to strike out a portion of the same, because it used such expressions as "permanently injuring and damaging" plaintiff and her property and "depreciated in value" the said property, in connection with the statement of the facts, constituting the injury and as legal results deduced therefrom, while the facts themselves, as to one part of the declaration, make out a case of only temporary injury and damages. Another portion thereof charges that the defendant actually took and appropriated to itself a portion of the lot, without giving any compensation therefor, by the construction thereon of a stone and cement wall and a large fill or embankment against the same and thereby permanently injured and damaged the same and rendered it less marketable and depreciated it in value. ° These expressions, indicative of a claim for permanent damages, occur in several different places and connections.

The two classes of claims are very generally recognized by the authorities, but we are aware of no decision forbidding the union thereof in one declaration or a single count, and no such ruling has been brought to our attention in the argument against the right so to unite such claims. In those instances in which the facts justify a claim for temporary damages only, the terms indicating a claim for the broader right may be

71 W. Va.

treated as surplusage and constitute no ground of demurrer, the facts constituting the claim for temporary damages being sufficient.

The injuries complained of in the declaration all flow from a single act of the defendant, the construction of a fill across a ravine, which fill, according to the claims of the declaration, is partly on the plaintiff's lot and partly on that of the defendant. This fill or embankment is of huge proportions. One witness says its vertical height at one point is about 35 feet, and the retaining wall along the base of it is six or eight feet high. The occupancy of a portion of the plaintiff's lot by this wall and fill, depriving her of the use thereof and rendering it unfit for use, is complained of. Other specifications of injury, resulting from the same cause, or the collection of surface water from a large area by means of a street and gutter on top of the embankment and the casting of the same over the wall onto her property, as well as the flow of surface water from the side of the embankment down on her property. Originally, the two adjacent lots sloped back from New Street to a ravine called Parker's Run, and the water naturally flowed back off of each lot into the ravine. Now, the embankment casts the surface water from its northern side over onto the plaintiff's lot. The street on top of the embankment, which seems to be a private one, made by the defendant to bring into market a great many lots owned by it, gathers and carries water for a distance of 300 or 400 feet Besides, the water is conducted by the defendant from a spring situate some distance beyond the two lots along or across the street; and cast, by means of pipes, over the wall onto the plaintiff's property, a few feet from the branch or creek in the ravine which passes through an arch under the fill. All of these facts are not given at length in the declaration, but the causes of injury are sufficiently stated therein and shown to flow from the construction of the embankment and wall. Another cause of injury stated is the collection of water by the defendant into a body by means of the roof of a house on its lot and casting the same upon the plaintiff's lot. This may be regarded as an act separate and distinct from the construction of the embankment and wall, but it was done by the same party and upon the same premises and works injury of the same kind, for which

reasons we see no valid objection to the inclusion thereof in the declaration along with the other acts complained of.

Having noted the absence of authority against the union of claims for temporary and permanent damages in the same declaration or count, we may, with propriety, say permission of such pleading accords with the general principles of the law of pleading. In cases of personal injury, claims for permanent or general damages are united with those for special damages. Several breaches of a contract may be assigned in a single count. *McCray* v. *Craig & Sons,* 70 W. Va. 735. "Various kinds of damages resulting from a single wrongful act may be united in one count." *Wolfe* v. *Beecher Mfg. Co.,* 47 Conn. 231; *Mullin* v. *Blumenthal,* 42 Atl. Rep. 175; 31 Cyc. 119-20; 5 Enc. Pl. & Pr. 732. Since the defendant's rights may be fully protected in the deliberation and conclusion of the jury by proper instructions, telling them what facts and circumstances call for temporary or special, and what for permanent, damages, he is fully protected against injury from confusion of issues.

The foregoing observations and conclusions, respecting the rulings of the court upon the demurrer, suffice to sustain its action in overruling the motion to strike out of the declaration the allegations concerning the construction of the wall and embankment on a portion of the plaintiff's lot and the flow of water from the roof of the building on the defendant's lot.

Objections to testimony and an instruction, which the court overruled, called for judicial determination of the character of the injury and the measure of relief in an action of this kind. Several witnesses were permitted to testify to their estimates and opinions as to the cost of removing the wall and embankment so far as they are upon the plaintiff's property, and two to give their opinions as to the depreciation in the market value of the property, occasioned by the existence of the wall and fill thereon. As to damage by the destruction of plaintiff's garden, shrubbery and fruit trees, loss of rentals or use of the property and cost of repairs, necessitated by the flow of water onto the lot, no itemized amounts were stated by any witness. The damage was stated in general terms. As the two items, estimated cost of the removal of the wall and embankment and depreciation in market value, constituted the large claims found

in the evidence, the rulings of the court respecting the same must have contributed very largely to the result of the trial. The exceptions thereto bring before us a very intricate and perplexing legal question.

. The distinction between permanent and temporary injuries to real property is discussed more thoroughly in *Henry* v. *Ohio River R. R. Co.*, 40 W. Va. 234, than in any other case decided by this Court. In it all of our former decisions and the authorities generally are considered and reviewed. The purpose of that discussion, however, was not to define what will constitute an injury of either class under all circumstances, or to lay down an inflexible criterion, but to determine whether the facts therein disclosed made that case one for permanent damages, so as to apply the statute of limitations, and it was decided they did not. The opinion says: "Where the nuisance is permanent, so that it will continue unless labor be applied to change it, and it necessarily injures the plaintiff, there must be a recovery in one suit for all damage, and none other can be afterwards brought, and recovery of damages will give the defendant right to continue his nuisance without further claim from the individual; but, where it is otherwise, there cannot be recovery for future damages." However, this must not be taken as matter of decision, for it was not, as the syllabus shows the observations were intended only as matter of discussion.

A thorough examination of the cases indicates that the question arises under variant conditions, leading to apparently inconsistent conclusions. A man may build a structure upon his own land and so inflict actionable injury upon his neighbor, or in the construction of a building or other work, he may go over the line onto his neighbor's premises and commit a trespass. In the former case, he may maintain the structure unless compelled by proper process to remove it, because it is on his own land. If he sees fit to suffer a recovery against him of permanent damages in a case proper therefor, and pays it and the plaintiff accepts it, or possibly without payment and acceptance, he acquires a right to continue it. If the injury constitues only ground for temporary damages, he may also continue it, until prevented by proper proceedings, but must pay the damages from time to time as they occur. These conclusions

would be inconsistent with legal principles in the other class of cases. The structure is upon the plaintiff's premises where it has no right to be. A recovery of permanent damages under such circumstances could not give the right to a continuance of the nuisance, if it be a nuisance, without passing the plaintiff's title to so much of the land as is occupied by it or an easement therein. In this state, neither can pass except by deed or will. Hence, one of the consequences of a recovery of permanent damages cannot consistently follow under such circumstances. If it did, the effect of the action would be to pass title or an easement in the plaintiff's property without a deed or will. Accordingly, we find few, if any, instances of recovery of permanent damages when the injury consists of an occupancy of the plaintiff's land by means of a structure. In actions against railroad companies for damages resulting from the construction of their roads upon land without having acquired the right so to do, only temporary damages are recoverable. *Uline* v. *Railroad Co.*, 101 N. Y. 98; *Railroad Co.* v. *Kernodle*, 54 Ind. 314; *Harrington* v. *Railroad Co.*, 17 Minn. 215; *Adams* v. *Railroad Co.*, 18 Minn. 260; *Ford* v. *Railroad Co.*, 14 Wis. 609; *Blesch* v. *Railroad Co.*, 43 Wis. 183. The continuance of a building upon another's land, after recovery of damages for its erection, is a trespass for which another action lies. *Esse* v. *Baker*, 48 Me. 495. Continuance of a wall upon the plaintiff's land, after recovery of a judgment for damages on account thereof, affords ground for a subsequent action. *Russell* v. *Brown*, 63 Me. 203. If a city enter upon the lands of a private person and attempt to appropriate them to its use, without right, the plaintiff may recover temporary, not permanent, damages. *Oklahoma* v. *Hill*, 30 Pac. 242. Only temporary damages are recoverable from a lumber company for building and operating a tramroad on plaintiff's property. *Lee* v. *Manufacturing Co.*, 43 S. E. 632. See also *McGann* v. *Hamilton*, 19 Atl. Rep. 376; *Stowers* v. *Gilbert*, 51 N. E. 282; *Book & Stationery Co.* v. *Jevne*, 179 Ill. 71; *Eno* v. *Christ*, 54 N. Y. Supp. 400; *Carl* v. *Railroad Co.*, 1 N. W. 295.

The measure of damages in all such cases, is the rental value of the property wrongfully occupied and withheld, with compensation for injury to the residue thereof and for any crops, shrubbery, trees and the like destroyed and injured. Such is

the rule declared in all the cases above cited. They do not authorize a recovery of the cost of the removal of the structure as a part of the damages.

This conclusion is logical. The opposite would allow the plaintiff to recover, on the theory of a necessary expenditure, money in fact not expended, and which may never be expended. Again, it is fair to the trespasser to allow him to abate the nuisance himself by the removal of the structure, as authorities say he may, since he may be able to do it for a great deal less than the estimated cost. Recovery in one action for all possible damage, future as well as past, in the case of a trespass such as this, would lead to inconsistent and illogical results in subsequent actions. Suppose, having recovered the estimated cost of abatement and the rental value in one action, the plaintiff sues again without having removed the structure. She has had the use of the money which may be practically or wholly equivalent to the use of the land, and has virtually deprived herself of the rental value or use of the land for the period covered by the subsequent action, by her failure to regain possession thereof by resort to appropriate and adequate remedies and either remove the structure or cause it to be removed.

The rules governing the elements and measure of damage in cases of the general class to which this one belongs must necessarily depend somewhat upon the peculiar circumstances of the case. There are no doubt many instances in which costs of repairs for injuries done, and possibly estimated costs, may be recovered, but, in such cases the defendant is not in the actual occupancy of a portion of the premises, and the plaintiff either has the power to remove the deposit or obstruction immediately or has already done so. In this case there may be recovered certain items of expense and damages suffered in addition to the rental value of the property, but not the cost of removing the structure which the defendant maintains and uses on the premises in question. As to this the authorities are emphatic and pretty generally uniform. There may be a few decisions inconsistent with the proposition. So the form of the testimony as to damages may no doubt vary with the circumstances of the case. If injury is done to property by deposit of earth, sand, ashes, slag or some other substance, by merely

dumping them thereon, in the absence of any occupation of the premises by the trespasser, and the effect of the deposit is to depreciate the market value to the extent of the cost of removing them, it may be proper to permit witnesses to testify to the extent of the depreciation of the premises in value in their existing condition, for the injury would be logically the equivalent of the cost of removal, and the injured party could either incur that cost by restoring his premises to their former condition or suffer loss equivalent thereto by selling the property without restoration.    These observations, applicable to a   case different from the one under consideration,   however,   are not to be taken as matter of decision.    Their purpose is merely to show that the rules vary with the circumstances of the cases.

For the foregoing reasons, the court erred in admitting testimony as to the cost of the removal of the wall and fill and as to depreciation in the market value of the property.

A great deal of the testimony, relating   to   the   plaintiff's title, as determined by her boundary lines and her possession, was admitted over objections of the defendant.    The character of this evidence and the basis of the objections thereto will be sufficiently indicated by the following facts and evidence:

Plaintiff's lot is one of a series or number of lots into which James D. Lloyd and Henry Cumpston and wife divided a tract of about four acres of land which they had acquired by deed dated February 10, 1892.    They divided it into two parts by a street, running generally north and south, on   each   side of which they staked off a row of lots, consisting of five each, all fronting on it.    The middle lot on   the   eastern   side   was conveyed to Tillie Higginbotham by deed dated   April   28, 1892.    A lot adjoining hers on the south was conveyed   to Mary Layman by deed dated June 15, 1892.    The lot adjoining the Mary Layman lot on the south was conveyed   to   Cappie Cumpston by deed dated December 3, 1896.    This lot came subsequently into the possession of the Fairmont Trust Company, which conveyed it to the Fairmont Real   Estate Company, the defendant.    On this lot, one of these companies erected the fill or embankment which the plaintiff claims extends over onto the southeast corner of her lot 11 or 12 feet. The controversy arises as to a triangle bounded on the north and

south by two lines, starting at an agreed point for a corner on the street, called New Street, and extending to the rear of the two lots and diverging at such an angle as to make a difference of 11 or 12 feet at that point. Mary Layman and Tillie Higginbotham were daughters of Henry Cumpston, one of the owners of the entire tract. In order that these two daughters might purchase two lots out of the tract, it was laid off into lots in the year 1892. Frank Higginbotham and Grant Layman, their husbands, testify that no compass or other magnetic instrument was used in laying off the lots. They say they, together with Henry Cumpston, took a tape line with which they made measurements and then staked off the lots. Commencing at the northern end on New Street, at a road called Mill Road, they divided the front into five lots, 60, 60, 70, 61 and 60 feet, respectively. They then went to the back of the strip of land on the line of the Leonard property, abutting the tract, and, commencing at Mill Road, measured and staked off the same distances. On arriving at the southeast corner of the strip, they found a surplus of about 12 feet on that side and that the lots so staked off were not at right angles with the street. Desiring to make them so, they went back to the beginning point from which to commence measurements of the rear lines of the lots. This threw the surplus land, a triangle of about 12 feet wide at the east end, into the lot next to Mill Road instead of the southern lot, making it 60 feet wide at the front end and 71 or 72 feet at the rear. They say they drove stakes at the corners of these lots as they were so finally laid out. Whether the stakes first driven on the back line were taken up they are not positive. They say, however, that, when their wives obtained their deeds, they entered into possession and soon afterward set posts on the line between the Layman lot and the Higginbotham lot and planted corner posts to both lots at New Street. Their houses were built in conformity with the lots as staked out, the Layman house seven feet at each end from the street and four feet all along from the line of defendant's lot. Witnesses say the posts between the Layman and Higginbotham lots are still there. There was no fence between the Layman lot and the Cappie Cumpston lot, but there was a recognized and used path extending part of the way back between the two lots. Up to this path,

the Cumpstons and their successor cultivated a garden on one side and the Laymans one on the other, until the latter conveyed the lot to the plaintiff by deed dated February 20, 1901. Grant Layman says in substance on this point they had out buildings there, a grape arbor and chicken coop, indicating the division line; there was nothing to indicate the line, except a path "down through below the chicken house"; he and Cumpston gardened up to the path; according to that line the wall stands on the Layman lot 11 or 12 feet; he and his wife used the triangle, not the bed of the run, but, with that exception, all of it; he thinks they had some trees and some raspberries set out; they set plum trees on the lower part and gardened the balance; toward the house there was a grape arbor and chicken house. The Cumpstons knew all of this and Mrs. Cumpston never set up any claim to any land below the line so recognized, though her husband at one time did claim the surplus land was in his wife's lot. The testimony of Frank Higginbotham agrees with that of Layman as to the staking out of the lots and the planting of the posts between the Layman and Higginbotham lots, and the building of a fence part of the way on that line. He says Mrs. Layman and her husband used all of lot 2 with reference to the line of posts. J. O. Carpenter owned the Capple Cumpston lot and resided upon it for a while. He says he gardened only up to the walk way, 12 or 14 inches wide, and the plaintiff occupied all the ground below the line as she now claims it, designated on one of the maps by a line from C to D. Mrs. Lyons, the plaintiff, says she and the Cumpstons and Patterson recognized the path as the line, and gardened up to it, and that she had fruit trees, plum and peach, on the triangle. When the agent of the defendant or the Fairmont Trust Company came and commenced the wall or the excavation for it, he dug up a part of her garden and the trees. She says she had there plum trees, potatoes, corn and beans. She did not cultivate any garden on the land between Parker's Run and the Leonard line, but did have some peach trees there. Some evidence tends to show this small portion of the triangle, only 10 to 15 feet long, was low and swampy. A witness for the defendant says there was nothing there but grass and weeds. The buildings on

the two lots were erected in 1892 and occupied for the first time in the fall of that year.

The description in the original deed for the plaintiff's lot as well as that of the defendant's and some others of the series, on both sides of the 30 foot street between the two rows, are said to be inconsistent with the locations claimed by the plaintiff and her witnesses. The magnetic courses called for in these deeds, it is claimed by the defendant, locate the lines so as to give to it the triangle in question. The plaintiff denies that the courses called for in the deed were ascertained by any survey of the lots made at or before the time of the execution thereof and there is no proof that any such survey was made. A witness for the defendant who prepared the deed from Lloyd and Cumpston to Mary Layman says he got the description of the lot from the grantors, he supposes. He only knows he prepared the deed at the instance of Mr. Cumpston, and he has no knowledge or recollection of any survey of the lots. A survey made from the calls in the deed for the purposes of this action indicate, by a plat thereof, that the triangle in question belongs to the defendant, and one of the witnesses for the plaintiff, a surveyor who made a plat in accordance with the plaintiff's claim and took the line of posts between the Layman and Higginbotham lots as the basis for his plat, admits that a survey by the deed, allowing for the variation on account of time, would give the defendant the land in dispute; but, if the courses were merely adopted from the exterior boundaries of the four acre tract ascertained by a survey made in 1868, as the plaintiff suggests, these courses applied now, allowing for variation, would give the defendant only about one-half of the disputed area, according to the testimony of the surveyors. Seeking support for this suggestion and claim, the plaintiff's attorneys elicited from the surveyors admissions that a line run on the bearing of the deed from the agreed corner near the south end of Center street, allowing variation for time from its date, would not follow the street line, but would be over in the street several feet at the north end, and it appears that the line actually run for the east line of New Street, from the recognized corner at the north, falling within the plaintiff's lot to the east of the recognized street line, would cross the front of her porch. To avoid this,

the Shuttleworth plat, the accuracy of which the plaintiff denies, makes an angle in the east line of New Street at the common corner of the Layman and Higginbotham lots. Corroboration of the Shuttleworth survey and support to it are sought in certain fences in front of, and between, lots on both sides of the street, but as to the age and character of these fences, there is ·conflict in the testimony.

The plaintiff's deed calls for a course along the Leonard line, the line of the rear end of the lot, S. 9.5 E. to a stake at the corner in dispute and thence S. 79 W. to the street. The deed from Lloyd to Cappie Cumpston for the defendant's lot calls for no courses. The description starts with the corner of the Layman lot, runs 60 feet with the street to the corner of the lot of the Vanatta heirs, thence with the line of their lot to the line of Joseph McElfresh and with his line "fifty (50) feet more or less" to the line of Mary Layman. The deed to Tillie Higginbotham described her line as commencing at a point 120 feet from the river road and running S. 11 E. 70 feet with the line of the street to a stake, thence N. 79 E. to the Leonard line, thence with the Leonard line 70 feet to a stake and thence S. 79 W. in a direct line to the place of beginning. The lot next to the Mill Road which, witnesses Higginbotham and Layman say, was made to include the triangle, was conveyed to Clyde S. Hoult whose deed described it as one of the uniform width of 60 feet to the Leonard line and thence along said line to Mill street, and thence along the street to the beginning. The remaining lot was conveyed to S. M. Riley. No courses are given in the deed conveying it. It calls for a corner and a line of Tillie Higginbotham. If the triangle in dispute goes ·into the Cappie Cumpston lot, now owned by the defendant, it will be 61 or 62 feet wide at the eastern end while the deed calls for 50 feet more or less. If it goes into the Hoult lot at the other end of the row of lots, that lot will be 71 or 72 feet instead of 60, along the Leonard line. The confusion, resulting from carelessness or negligence in laying off and conveying these lots is, therefore, very apparent.

Under well settled rules, the plaintiff was entitled to prove not only the location of the artificial monument, the stake called for as the southeast corner of her lot, and also her possession up

to the line claimed by her, even though the jury might have found the triangle is not within the lines as determined by the deed. Though the artificial monument called for was not found upon the ground, the testimony respecting its location was direct, positive and unequivocal. If the jury could ascertain its location from this evidence, strengthened as it is by other facts and circumstances, it was their duty to let it prevail over the course called for in the deed in reaching a conclusion as to the location of the line. Monuments, if found and identified, or the ascertained locations thereof, always prevail over calls for courses and distances in cases of conflict. *Teass* v. *St. Albans*, 38 W. Va. 1. The evidence of possession up to the line claimed by the plaintiff and of acquiescence therein by defendant's predecessors in title, was admissible to prove title by adverse possession and also an agreement as to the boundary line. The test of admissibility is the tendency of the evidence to establish the fact in question, in the absence of any rule barring it on account of its character, and its efficiency to justify instructions is governed by the same rule. An instruction may be based on any evidence appreciably tending to prove the affirmative of the question submitted in the instruction. It need not be sufficient to sustain the verdict. *State* v. *Clifford*, 59 W. Va. 1.

All of the thirteen instructions given at the instance of the plaintiff were excepted to and the objections to none of them have been waived. Only Nos. 7, 8, 9, 10, 11 and 13, however, are specifically discussed in the brief. Plaintiff's instructions Nos. 1, 2, 3 and 4 are good under the law already stated, respecting the superiority of monuments over courses and distances in the ascertainment of boundary lines.

Instruction No. 7 authorizes the jury to include in the verdict for the plaintiff, in case they should find for her, the cost of restoring her lot to the condition in which it was before the wall and embankment were built thereon. Under principles already stated, she is not entitled to recover that item. Hence, the instruction should not have been given.

Instruction No. 8 authorized a verdict for the plaintiff if the jury should find that she was in the actual possession of the triangle at the time of the trespass, in the absence of proof of title to the disputed premises in the defendant. The legal propo-

sition embodied in this instruction is neither questioned nor denied, but it is said not to be applicable, because the plaintiff has not regained possession of the part of the lot withheld from her. This is an objection to the remedy rather than to the instruction, a question arising in another connection and yet to be disposed of.

Instruction No. 9 embodies the same legal proposition and also the hypothesis of title by adverse possession. The first branch thereof requires the defendant to prove to the satisfaction of the jury, by a preponderance of the evidence, that it, at the time of the trespass, was the true owner of the triangle or entitled to the possession thereof. We see no objection to this requirement of proof. The state of the title at the time of the trespass was the vital factor in the inquiry submitted. To justify its action, the defendant was bound to show title in itself by proof, and, in the event of conflict in the evidence on that point, it could not prevail without showing a preponderance in its favor, since it has the affirmative of the issue.

The propriety of the action of the court in submitting the second inquiry of the instruction depends upon the existence or non-existence of evidence appreciably tending to prove the fact, as has been stated. The tendency of the evidence to prove possession to the line claimed by the plaintiff is clear. According to it, she and her predecessor in title occupied and used the lot up to that line from sometime in the year 1892 until the wall was built in the fall of 1902 or 1903. As the land in dispute was not enclosed by a fence, it becomes necessary to say whether cultivation and improvement up to the line claimed, without enclosure, will sustain a claim to title by adverse possession, and, if so, whether such cultivation and improvement must go to the line at every point. In *Core v. Faupel*, 24 W. Va. 238, 245, Judge SNYDER said a claimant without color of title could claim nothing beyond his enclosure and cited *Kincheloe v. Tracewell*, 11 Grat. 587, but other portions of his opinion in the same case are inconsistent with this general statement, showing he used the term "enclosure" in a sense more general than actual physical enclosure. In neither of these cases, however, was the question actually involved or decided. For the contrary of the proposition, and the soundness of the

many observations on the subject found in our decisions, we have the high authority of Justice Field in *Zeilin* v. *Rogers*, 21 Fed. Rep. 103, saying: "Neither residence upon land nor its inclosure by artificial means is absolutely necessary to create an adverse possession, even where the premises are not claimed under color of title. Either of these circumstances is strong evidence to establish such possession; but it may be shown in other ways. A subjection of the land by the claimant to such uses as it is ordinarily susceptible of, to the exclusion of others, is an adverse possession; and that subjection may appear by its cultivation or occupation for the ordinary purposes of husbandry or pasturage. The extent of the land to which an adverse possession is claimed must, of course, be clearly indicated, so that others may see and respect it, but it need not be shown by an artificial inclosure. It is to an inclosure of that kind that the instruction asked and the one given in the charge of the court evidently had reference. The former speaks of an adverse possession of land within limits which the *defendant actually incloses*. 'In a settled farming country', says the judge, 'where there are known boundaries to claims and possessions, it is sufficient if the occupant exercise ownership over the land.' Others objects than an artificial structure in the nature of fences may mark the limits of the possession claimed; such as ravines, water-courses, and the like. And furrows in the field, mounds at short distances apart, and many other devices, not constituting strictly an inclosure, may equally answer the purpose. The subjection of the land to the uses of the claimant, to the exclusion of others, and the identification with reasonable certainty, according to the circumstances of the case, in some visible or appreciable way, of its extent, are the material facts necessary to establish adverse character of the possession. In many decisions an inclosure is spoken of as essential, because the limits of the land in question could only be marked conveniently in that way. But the essential fact is the indication, given by the inclosure, of the limit to which the possession claimed extends. None of the authorities deny the equal efficacy with an artificial inclosure or other defined boundaries or means of indicating the limits of a tract to which the possession of an occupant extends." That the fences need not go all the way

around was held in *Dennett* v. *Crocker,* 8 Me. 239. This law accords with the declaration of this Court in *Oney* v. *Clendennin,* 28 W. Va. 34, to the effect that title by adverse possession under a claim of title only may be made out by actual possession of the land by inclosing it under fence or by clearing it or in some other visible and notorious manner. "One in adverse possession of land without paper title has adverse possession only to the extent of his inclosure or actual improvement." *Parkersburg Industrial Co.* v. *Schultz,* 43 W. Va. 407. "Where there is no paper giving color of title defining the extent of adverse possession, but is only under claim of title, the possession will be limited to inclosure, clearing, or actual improvement." *Jarrett* v. *Stevens,* 36 W. Va. 445. See also *Wade* v. *McDougal,* 59 W. Va. 113, actually deciding the point. To make the possession open and exclusive within the meaning of the law of title by adverse possession, nothing is required beyond acts clearly indicating a claim of ownership of the property and the extent of the claim. The occupancy need not be such as physically to bar out trespassers, but only to manifest unequivocally a claim of ownership on the part of the occupant and preclude all others, not merely from trespassing upon it, but from using it as their own or in common with the claimant. Obviously, this may be done in more than one way and what acts are sufficient depends upon the condition of the land and its adaptability to use. If it is woodland, an inclosure is about the only reasonable mode of defining the extent of the claim. If it was originally woodland and the occupant has cleared a certain portion of it and cultivated it regularly and constantly for the statutory period, such improvement and use make out title to the part cleared, but no more. If he enters upon a portion of a field or territory already cleared and fences in a portion of it and holds and uses it for the statutory period, his intention is manifested as clearly as in the case of fencing in a piece of woodland. If, on the other hand, he cultivates a portion of it every year up to a certain point and openly uses it as his own, defining the limits of his claim by his use thereof, he thereby effects as clear a manifestation of intent as he does by clearing and cultivating a piece of land that had been in its natural state.

As the instruction on the law of adverse possession extends

to the whole of the triangle and the plaintiff shows, as evidence of possession and dominion between Parkers' Run and the rear line of her lot, only some peach trees on it, lack of sufficient use or occupancy of this portion is suggested, on the theory that the cultivation must extend to the line at every point. A majority of the Court are of the opinion that this is unnecessary. The property involved is a portion of a town lot, the lines of which were known by everybody familiar with it to be straight. The cultivation indicated the course of the line claimed clear through from one end of the lot to the other and the planting of peach trees beyond the run indicated that that claim extended beyond it and amounted to an actual improvement and use of the portion of the lot. In *Zeilin* v. *Rogers*, Justice Field uses language sustaining this view, saying: "And furrows in the field, mounds at short distances apart, and many other devices, not constituting strictly an inclosure, may equally answer the purpose." The purpose referred to is the indication of the claim as to the line, the portion of the property to which the claim of title extends. Plaintiff's instruction No. 10 is of the same character as the latter part of instruction No. 9, which we have discussed and approved.

Instruction No. 11 embodied the theory or hypothesis of an agreed division or boundary line under the well known law applicable to that subject. Its applicability is denied on the theory of lack of evidence of acquiescence. Practically all of the evidence tending to prove acquiescence has been stated and we think it is sufficient. Failure of Mary Layman, the former owner of the plaintiff's lot, to testify and the testimony of Harry Cumpston, the husband of Cappie Cumpston, to the effect that he remonstrated against the claim of Mary Layman, are dwelt upon in the argument against the instruction. There is no proof that Mary Layman personally made any verbal claim as to the location of the line. Her husband testified that he claimed it for her. The absence of proof of her verbal claim does not do away with the force and effect of her acts. She occupied and used the land up to the line in controversy with the knowledge of the adjacent owner. This certainly constitutes sufficient evidence of the claim on her part to justify an instruction. As to the remonstrance, there is conflict in the

evidence. Grant Layman denies practically all of the conversations and admissions attributed to him by Harry Cumpston, and also that he ever remonstrated against the adverse claim while he was owner of the land, and also that any demand was ever made by him at any time for the alteration of the line. Harry Cumpston once owned the property and his wife owned it at another time. Layman says there was never any dispute between him and Cappie Cumpston as to the line, but that he and her husband had a few words about it once, but that was after he had parted with the title and when his wife was the owner of the land. We do not think this sufficient to preclude the giving of the instruction.

Instruction No. 13 stated the law as imposing liability upon the defendant for injury and damage to the plaintiff's property by maintaining and keeping the wall and dirt thereon, if the jury should find the Fairmont Trust Company had placed the wall and dirt on her land, while the plaintiff was the owner thereof and in possession of it, and was the owner thereof at the time the suit was brought and in possession, and that the Fairmont Trust Company afterwards sold the wall, dirt and stone, with adjoining ground, to the defendant, and the defendant, after purchasing the same, used and kept the wall and dirt on her property. One ground of objection to this instruction is alleged lack of proof that the Fairmont Trust Company sold the wall, dirt and stone to the defendant. It sold the Cumpston lot to the defendant and put it in possession thereof, and thereafter the defendant made the same use of that lot and the embankment that its grantor had made of it. Its claim of title to the triangle and right to maintain the wall is asserted under the deed from its grantor. So we think the objection untenable. We have examined instructions Nos. 12, 14 and 15 and found them unobjectionable.

For reasons stated, the court properly refused defendant's instructions Nos. 7 and 8, each of which would have required the jury to ignore the evidence of the claim to lines and a corner different from those indicated by the courses called for in the deed. Defendant's instruction No. 9, intended to tell the jury as a matter of law, that plaintiff's declaration does not cover the land in controversy, was also properly refused. In its

description of plaintiff's lot, the declaration follows the deed, calling for a stake, an artificial monument, controlling the calls for course and distance. Defendant's instruction No. 11 would have been misleading and was properly refused for that reason. Its purpose was to tell the jury they could allow nothing as damages on account of water or mud shown to have passed or flowed over the defendant's property onto the plaintiff's. Some of this water ran from the top and sides of the embankment. For damage resulting from it, no recovery could be had under well settled law. An owner of property may improve it and change its character as he pleases, and if, in so doing, he incidentally casts surface water upon adjacent premises, without collecting it into a body, he is not liable for any resulting injury. But, if, in the improvement of the property or otherwise, he collect the surface water thereon and cast it in a body upon his neighbor's premises, he is liable. Part of the water came from this embankment by natural flow from the same and part of it was collected and cast over in a body. This instruction would have relieved the defendant from damages in both instances, or, to say the least, was so worded as to leave it open to a construction by the jury under which it would have had such effect.

The right to recover at all in this action is challenged upon two grounds: (1) lack of evidence of title to the triangle, and (2) inapplicability of the remedy. The first has already been disposed of in passing upon the rulings as to the evidence and instructions. Ejectment is said to be the appropriate and exclusive remedy because the defendant is in possession of the triangle, claiming title thereto, and it is said the question of title, disclosed by the evidence, cannot be tried in an action of trespass on the case. The authorities cited in support of this contention, including *Park* v. *Morris, Layfield & Co.,* 63 W. Va. 51, deal with instances in which the plaintiff neither has, nor ever had, possession, or has been wholly ousted, so that the action has for its real purpose and object only the title. They are not applicable under the circumstances of this case. Here, the plaintiff is in possession of the lot and once had possession of the triangle in dispute and the defendant and its predecessors in title had never had possession of any part thereof prior to the trespass complained of. "Title to land gives to the owner

constructive possession of it so as to enable him to maintain trespass, unless there is adverse possession or right in some other person by contract or operation of law to the exclusion of the owner." *Storrs* v. *Feick,* 24 W. Va. 606. Here the plaintiff had actual possession and has never been wholly ousted or excluded, while the defendant never had actual possession until the alleged tresspass occurred. The title is only incidentally involved under such circumstances, the real purpose and object of the action being the recovery of damages.

The action of the court in refusing nine special interrogatories to the jury, requested under the provisions of section 5 of chapter 131 of the Code, is complained of. No. 1 asked the jury to state in what year the excavation and wall were built; No. 2, what company made the excavation and built the wall; No. 3, whether the plaintiff was then owner of the land on which they were built; No. 4, how she became vested with the title; No. 5, which of the two lines indicated on the plat, if either of them, was the true line between the lots, and, if neither, where the true line is; Nos. 6, 7, 8 and 9, what damage was done by the entry on the lot and building of the wall, what amount of damage by a wooden trough on the wall, extending over on plaintiff's lot through which water passes and was discharged thereon, what amount of damage was done by the casting of mud, sand and filth on plaintiff's lot and what by surface water, rain and melted snow, collected and cast in a body on the lot by the defendant.

The court properly refused all of these requests because no response to any one of them, nor responses to all of them combined, whatever they might have been, would have been inconsistent with a general verdict in her favor, within the meaning of the statute. No. 1 is bad for immateriality, since the injury is a continuing one and the statute of limitations would not preclude recovery for damage within five years before the action was brought. It was evidently asked in view of the contention that the injury was permanent within the law of trespass. No. 2 is inconclusive because there was a liability upon the defendant for maintaining the excavation and the wall, if the plaintiff was owner of the lot or had possession of the same when the wall was built, although another company had actually

built it, in the absence of proof of title in the defendant. No. 3 was bad because the plaintiff's possession alone, without ownership of the land, was a sufficient basis of recovery, in the absence of proof of title in the defendant. No. 4 is bad for the same reason. Likewise No. 5. The remaining four seek only an itemization of the damages, in case of liability. They do not go to the question of liability at all. No combination of answers to all of them would have precluded a recovery.

The statute, authorizing interrogatories, was not designed to permit any and all sorts of questions, nor questions bearing upon material matters involved in a trial merely because of their materiality. The purpose was to enable a party to elicit a special finding on some question or a series of questions, which, if found in his favor, would show there is right to recover, in the case of the plaintiff, or the absence of any ground of liability whatever, in the case of the defendant, so that the court, in case of a general verdict contrary to the facts so specially found, may disregard the general verdict and render judgment in accordance with the special findings, not grant a new trial or scale down the verdict. The statute authorizes these special findings in either of two forms, separate verdicts upon one or more of the issues, or findings in writing upon particular questions of fact stated in writing. The final sentence of the section, dealing with the effect of such findings, and showing the purpose for which they are authorized, says: "Where any such separate verdict or special finding shall be inconsistent with the general verdict, the former shall control the latter, and the court shall give judgment accordingly." It was not intended to allow these interrogatories for the purpose of finding some ground upon which to obtain a new trial for insufficiency of the evidence as to some item in the demand sued for or the like, but to enable the court to see whether it shall give final judgment for the plaintiff or the defendant. In *Peninsula Land Co.* v. *Insurance Co.,* 35 W. Va. 666, this Court adopted the view here stated and announced its conclusion in the following terms: "The special findings, taken as a whole, must be clearly inconsistent with the general verdict, and, to be inconsistent, they must clearly exclude every conclusion that would authorize

a verdict for the plaintiff." The questions must go to such vital matters and be so framed as to reach them, else the court may properly refuse them. In the case just referred to, Judge HOLT said: "Inasmuch as they control the general verdict, and, when inconsistent therewith, the judgment of the court must be based upon them, the importance of submitting proper questions becomes apparent; for, if the questions are immaterial— that is, not decisive of the issue—the answers will be so also if responsive, so that it will be the duty of the court in that event to render judgment on the general verdict. The special findings, taken as a whole, must be consistent with the general verdict, or the fact found in any one or more of the answers must clearly exclude every reasonable conclusion that will authorize a recovery by the plaintiff. Such antagonism to the general verdict must be such as to exclude every ground of recovery that there is any evidence tending to prove." He interpreted *Bridge Co.* v. *Bridge Co.,* 34 W. Va. 155, as harmonizing with the views there expressed. In that case the Court said: "It is not erroneous to refuse to permit such questions to be propounded, when they are immaterial or irrelevant, and unless the answers thereto, if contrary to the general verdict, would control the same and be conclusive." *Kerr* v. *Lunsford,* 31 W. Va. 659, is to the same effect. In *Bess* v. *Railroad Co.,* 35 W. Va. 492, the jury, by its answer to an interrogatory, showed the plaintiff had failed to make out an essential element of his case. On the question, whether or not judgment should be rendered for the defendant, the court was equally divided, and, for that reason, a new trial was granted and the case remanded. Judge BRANNON, who wrote the opinion, said: "Judge LUCAS is of opinion that answer to question No. six relieves the uncertainty of answer to question No. five, and would affirm the judgment, while the other three members of the Court would reverse it. Judge ENGLISH and I would render judgment for the defendant because of the inconsistency of the answer to special question given with the general verdict." Clearly, therefore, a majority of the Court thought the purpose of interrogatories was not to obtain ground for a new trial, but to determine how final judgment should be rendered. The ruling

in *Pennington* v. *Gillaspie,* 66 W. Va. 643, adheres to the same principle. That was an action under the civil damage act against a saloon keeper. Punitive damages could not be inflicted unless there was actual damage. The trial court refused an interrogatory as to how much actual damage the plaintiff had suffered, and this Court held that it should have been given, saying: "Before exemplary damages can be found actual damages for injury to the person, property or means of support, supported by evidence, must be found."

After having found reversible error, outside of the ruling on the motion to set aside the verdict, we do not, as a rule, inquire as to the sufficiency of the evidence. We do so, under such circumstances, in very plain cases only, a class to which this one does not belong.

For the errors noted here, the judgment will be reversed and a new trial awarded.

*Reversed, and New Trial Ordered.*

ROBINSON, JUDGE, (*dissenting in part*).

The last statement in point 8 of the syllabus does not meet my approval. Where one is holding under mere claim by possession—has no paper to define the the the extent of his possession—it goes no farther than his actual possession by inclosure, cultivation, or improvement. He can not merely claim to an imaginary line. His possession, which is the sole basis of his claim, can take him no farther than it actually goes.

In this view Judge BRANNON concurs.