
## WILLIAM MORGAN, Respondent, v. THE OREGON SHORT LINE RAILROAD COMPANY, a Corporation, Appellant.

### No. 1494. (74 Pac. 523.)

1. **Bill of Exceptions: Failure to Serve: Allowance.**

An objection to, and a motion to disregard, a bill of exceptions, because it was not served on opposing counsel within 30 days from the denial of a new trial, as required by Revised Statutes 1898, section 3286, is a "proceeding" in an action within section 3005, providing that the court may, in furtherance of justice, upon such terms as may be just, relieve a party from a proceeding taken against him through his mistake, inadvertence, surprise, or excusable neglect; and hence the court may relieve against the failure to serve in time, and settle the bill.

2. **Railroads: Trespasser: Liability for Death.**

When a trespasser boards a passenger train to steal a ride, he assumes all the risks incident to his undertaking, and the company owes him no duty except to prevent its servants, while acting within the scope of their employment, from willfully, wantonly, or intentionally injuring him.

3. **Same: Sufficiency of Evidence.**

Where, in an action for the death of a trespasser stealing a ride on a passenger train, plaintiff's evidence shows that the body of decedent was found at a point from one to two miles distant from the place of his ejection, and on the opposite side of the track, and plaintiff alleges and his proof shows that the injury received by decedent must have occasioned instant death, the evidence fails to show a casual connection between the ejection and the injury, and hence necessitates a nonsuit.

4. **Same: Right to Eject Trespasser.**

A railway company has a right to stop its train to eject a trespasser, and in doing so has the right to use such force in a reasonable way, under the circumstances, as is necessary to accomplish that object; and in doing this is liable only for willful, wanton, or intentional injury.

(Decided December 14, 1903.)

Appeal from the First District Court, Box Elder County.—*Hon. C. H. Hart*, Judge.

Action to recover damages for the death of plaintiff's son alleged to have been caused by the negligence of defendant. From a judgment in favor of the plaintiff, the defendant appealed.

REVERSED.

*P. L. Williams, Esq.,* and *Geo. H. Smith, Esq.,* for appellant.

Under the facts, the plaintiff's son was of course a trespasser, to whom the railroad company owed no positive duty and would only be liable for a wanton, willful or intentional injury. Ill. Cent. R. R. v. King, 179 Ill. 91, 70 Am. St. 93; Richmond & D. R. R. Co. v. Burnsed, 70 Miss. 437, 35 Am. St. 656; Bess v. Chesapeake & Ohio R. R., 35 W. V. 492, 29 Am. St. 820; Planz v. Boston & Me. R. R., 157 Mass. 377; P. C. C. & St. L. v. Redding, 140 Ind. 101; Ry. Co. v. Meacham, 91 Tenn. 428.

*J. D. Call, Esq.,* and *C. C. Richards, Esq.,* for respondent.

## STATEMENT OF FACTS.

The plaintiff brought this action to recover damages for the death of his son, which he alleges in his complaint to have been caused by the "reckless, wanton negligent, unlawful, willful, and malicious conduct of the defendant and its servants" in the operation of the railroad company's train. From the evidence it appears that in the afternoon of the fifth of January, 1901, six young men by the name of Hunsacker, 18 to 22 years of age, residents of Honeyville, a town on the line of the defendant's railroad, boarded a freight train and stole a ride to Brigham City for the purpose of attending an entertainment that night at the theater. After the entertainment they went to the railway station at Brigham City to get a train to return home. There they met

plaintiff's son, John Morgan, nearly 19 years of age, and another young man by the name of Olsen, Morgan's companion. These two boys had been drinking during the .evening, and Olsen was intoxicated, but as to whether or not Morgan was much under. the influence of liquor the evidence is conflicting; that of the plaintiff being to the effect that he was not, that of the defense that he was. These parties, after arriving at the station, all remained there awaiting the arrival of the passenger train, due at 1:05 that night, and in the meantime three of the Hunsacker boys, to insure the stopping .of that train at Honeyville, where it was not scheduled to stop except when passengers were on board to alight, purchased tickets, but upon concluding that the same purpose could be accomplished with one ticket, two of the boys returned their tickets to the agent, and received a return of the money paid for them. When the train arrived, the boy who had the ticket went into a car, the rest got on the train wherever they could. The Morgan, Olsen, and three Hunsacker boys climbed on top of the coaches. The two that were not on top of the cars were discovered soon after the train had started, one of them having attempted to ride on the pilot of the engine, and, upon the speed of the train being slackened, they got off. Before reaching Honeyville the train was stopped several times to put these parties off, and was delayed thereby 25 minutes. The plaintiff's testimony tends to show there were but three stops, while according to that of defendant there were four made. The five trespassers on top of the train rode there until the second or third stop was made, when some one, they having been discovered, required them to get down. As they got down, they immediately ran around the rear end to the west side of the train, and got on there, and, as the Hunsacker boys passed along on the west side, they, according to their testimony, saw Morgan helping Olsen up on the steps under the vestibule doors at the front end of the rear car, and they saw Morgan climb up onto the steps at the rear end of the second car. Af-

ter the train had started and was running, according to the testimony of the Hunsacker boys, about as fast as a man could run to keep up with it, a trainman with a lantern ran along the side of the train from the rear end to Olsen, and taking him by the leg, pulled him off the train.   He then went to Morgan and pulled him off likewise.   Both fell to the ground on the west side of the track as they were pulled off, and Olsen rolled out across some ice.   The trainman then got on board the train at the rear end of the last car as it passed by, and it appears, no one saw what became of Olsen and Morgan, or what they did after they were pulled off the train.   After proceeding some distance, the train was again stopped, and the remaining four of the trespassers were put off.   Respecting this affair the plaintiff's witness Israel Hunsacker, one of the trespassers, in the course of his testimony, made statements as follows: "I should judge it was 1½ or 2 miles out from Brigham when the first stop was made.   I should think, when the second stop was made, that would be six or seven miles from Brigham.   When the train stopped at this time one of the trainmen came up on top of the train.   He walked up to where the boys were, and they got up and went to the hind end of the train, and got off.   Then he came up to where we were, and we got off.   When we got off the hind end of the train we ran around on the west side, and as Parley and I went around John Morgan was helping the Olsen boy up under the vestibule on the front end of the rear car.   By the vestibule I mean the doors which are built over the steps.   We ran on up to the next car, and got on there, and, looking backwards, Morgan was just crawling under the door on the rear end of the second car, which would be one car length from us.   It was a moonlight night.   After that, while the train was going, I saw a man carrying a lantern come from the rear end of the train up alongside of it, and run up to where the Olsen boy was, and caught him by the legs and yanked him out.   Then he ran up and caught the Morgan boy by the legs, and pulled him

out.   The train was in motion by that time, but I don't know how fast.   It was going about as fast as a man could run.   The man with the lantern caught on to the rear end of the train when it came by.   I saw Morgan fall to the ground, and did not see any more of him. This was about half-past one or two o'clock in the morning.   When the Olsen boy was pulled out from the train he rolled out across the ice nearly to the fence on the west side of the track.   The Morgan boy fell down by the side of the track.   I didn't see him get up.   I didn't see either the Olsen or the Morgan boy any more.   I didn't see John Morgan get on the train at either place after he was taken off.   I saw the trainman board the train.   He took the rear end of the train.''   On cross-examination the same witness, among others, made the following statements:   ''Some time after we had been at the depot, we went inside.   The crowd of us were outside most of the time, walking about and chatting, laughing and joking.   I bought a ticket, and two of the other Hunsacker boys did also.   They were Okham and Newman.   Then, when the train came in, two of the boys went back and got the agent to refund the money and take the tickets.   I was one of them and Newman was the other.   That left Okham with the ticket.   We had purchased the tickets in order to make sure that the train would stop at Honeyville, for that was not a regular stop for that train, and it would not stop there unless there were passengers to get off.   So we planned to have one ticket on the train, so that it would be sure and stop that the others might get off.   After we found that we had purchased three tickets among us, we took two of them back, because one would answer the purpose as well as three.   The gentleman took our tickets back and returned our money.   Okham, who had the ticket, went into the train.   He was the only one of us that did go into the cars.   The rest of us commenced to board the train wherever we could.   Besides the six Hunsacker boys, there was John Morgan and this Olsen boy.   I knew at the time that we went to the station and entered

upon this enterprise that we were stealing a ride, and knew that we had no business there upon the train. When we were taken down from the top, we went around on the west side and got on again. I saw the Olsen and the Morgan boy as we ran up by the side of the train to get on a car length ahead of them. When we got a car length past them, we stood on the bottom step and hung onto the platform. We were not in the vestibule at all, but between the two vestibules. Just as we got in our position, a man came from the rear end of the train, and he was the man that took hold of these boys and pulled them off. The train was not going so fast at the time these boys were taken off but what this man, whoever he was, could keep up easily with it and take hold of these boys. When these boys were put off, we did not pay any more attention to them or to their actions. We watched the man with the lantern, and saw him get on the rear end of the train. After the train had gone a mile or two further from that place, it stopped again, and we were put off, and kept off. There was then Parley, Alma, Clarence and myself. The transaction spoken of at the stop before, when the Olsen and Morgan boys were put off, was all on the west side of the train. I did not know anything that was going on on the east side of the train.'' Similar testimony was given by the other parties, who witnessed the occurrences that night, and testified for the plaintiff. The next morning, on the sixth of January, the dead body of the Morgan boy was found lying on the east side of the railroad track, about 8 miles north from Brigham City station, and about 2 or 2½ miles south of Honeyville. His head and shoulders were close to the ends of the ties and his feet further away. Upon examination it was found that all the bones in the left side of his head were crushed and broken into small pieces. About one-half of the head was crushed, and according to the evidence death must have been produced instantly. What became of Olsen does not appear from the record.

27 Utah · 7

At the trial, when the plaintiff rested, a motion for non-suit was made and overruled, and then, after the testimony of the defense was introduced and the case was submitted to the jury, a verdict was returned in favor of the plaintiff, for the sum of $2,500, and judgment entered accordingly. The defendant appealed.

BARTCH, J., after a statement of the case, as above, delivered the opinion of the court.

The question to be considered upon this appeal are presented through a bill of exceptions and the respondent has interposed a motion to strike out the bill upon the ground that the same was not served upon counsel for the plaintiff within thirty days from the time of the overruling of the motion for a new trial, as provided by statute. Section 3286, Rev. St. 1898. It is insisted that the court had no authority to settle and allow the bill, and relieve the appellant from the consequences of its failure to serve the bill in time, the same not having been served until 32 days after overruling the motion for a new trial. The appellant contends that the court had the power, under section 3005, Rev. St. 1898, to grant the relief. That section, among other things, provides: "The court may, in furtherance of justice, . . . upon such terms as may be just, relieve a party or his legal representative from a judgment, order or other proceeding taken against him through his mistake, inadvertence, surprise or excusable neglect." This provision in express terms confers power upon a court to relieve a party from any "proceeding taken against him through his mistake, inadvertence, surprise, or excusable neglect." Within the meaning and intent of the provision, a settlement of a bill of exceptions is a proceeding in an action, and so is also an objection to such bill, and a motion to disregard it on the ground that it was not served upon opposite counsel within the time specified in the statute. The court therefore had the discretionary power to grant the relief sought upon a proper

showing having been made therefor; and we think the showing made herein was sufficient to entitle the appellant to the relief granted. There is nothing to show an abuse of the discretion on the part of the court. The discretion in this case was manifestly exercised in accordance with the terms and spirit of the statute, and this court will not interfere therewith. The Supreme Court of California, as to a similar provision of statute, has ruled likewise. Stonesifer v. Kilburn, 94 Cal. 33, 29 Pac. 332; Scott v. Glenn, 97 Cal. 513, 32 Pac. 573.

When the plaintiff rested, the defendant interposed a motion for a nonsuit upon the grounds, *inter alia,* that the evidence disclosed no acts on the part of the railroad company, or set of circumstances, showing or tending to show that the deceased was either wantonly, or willfully, or maliciously, or intentionally injured by any of its authorized servants acting within the scope of the employment; and that the evidence failed to connect the time, place, or circumstances of the injury and death of the deceased with any such act of the defendant. This motion was overruled, and the action of the court in the premises has been assigned as error. The appellant insists not only that there was no proof to warrant the overruling of the motion for a nonsuit, but also that, after the introduction of all the evidence in the case there was no proof to justify the verdict of the jury, and that, therefore, the defendant's motion for a new trial, which was also denied, should have been granted. After a very careful examination of all the evidence contained in the abstract of record, we are of the opinion that the contention of the appellant, both as to the motion for nonsuit and for a new trial, is well founded. The deceased was not a passenger, and there was no obligation imposed by law upon the railroad company to carry him safely. There were no contract relations existing between him and the railroad company. Nor were the parties brought into such a situation that they had relative rights, so that out of their relations a duty on the part of the company arose other

than what it owes to a trespasser. The deceased, with his companions in wrong, was a mere naked trespasser, with intent to perpetrate a wrong upon the company by attempting to secure a ride upon its train without payment of fare. When he boarded the train, as he did, without right, he assumed all the risks incident to his perilous undertaking, and the company owed him no duty and was under no responsibility to him except to prevent its servants, while acting within the scope of their employment, from inflicting any wilful, wanton, or intentional injury upon him. "Under settled rules of public policy, railway companies are not to be made liable for injuries received by trespassers upon their trains, unless the injury is inflicted under circumstances indicating wantonness or willfulness in the servants of the companies." Railway Co. v. Burnsed, 70 Miss. 437, 12 South. 958, 35 Am. St. 656; I. C. R. R. Co. v. King, 179 Ill. 91, 53 N. E. 552, 70 Am. St. 93; Planz v. Boston & A. R. R. Co., 157 Mass. 377, 32 N. E. 356, 17 L. R. A. 835; P. C. C. & St. L. Ry. Co. v. Redding, 140 Ind. 101, 39 N. E. 921, 34 L. R. A. 767; Bess v. C. & O. R. Co., 35 W. Va. 492, 14 S. E. 234, 29 Am. St. 820; Railroad Co. v. Meacham, 91 Tenn. 428, 19 S. W. 232.

Viewed in the light of the foregoing principles, is the evidence now before us such as to entitle the plaintiff to recover damages against the railroad company? In determining this question we will assume, although it is not clearly proven, that an employee of the company pulled the deceased from the train or steps of the car. The burden of proof was upon the plaintiff to show that the employee willfully, intentionally, or wantonly caused the injury which resulted in death, and, unless the act of pulling the deceased from the steps of the car occasioned such injury, there is absolutely no evidence to render the company liable, for there is no proof whatever that, subsequent to that occurrence, any one of its employees either saw or laid hands on the deceased. Now, the transaction of pulling

the deceased from the steps, according to the undisputed testimony—in fact, according to the plaintiff's own testimony—occurred at the next to the last stop the train made for the purpose of ejecting these trespassers, at a place about six or seven miles north of Brigham City, on the west side of the train, and the following morning the dead body was found about eight miles north of Brigham city, lying on the east side of the railroad track. So that the only act in evidence upon which the plaintiff could at all rely for a recovery was done or committed on the west side of the railway track, at a point from one to two miles south of the place where the body was found on the east side of the track. Turning now to the pleadings, it will be observed that the plaintiff alleges that the deceased died "immediately" upon "his skull being crushed and broken," and the proof shows the injury to have been of such a character as would produce death instantaneously. The injury having thus admittedly caused instant death, it is manifest that the act of the employee was not the cause thereof. This is a fact, as will be noticed, which is susceptible of demonstration from the proof submitted by the plaintiff himself, as well as from the whole evidence. To pursue the evidence further in detail would be useless, for it is apparent that when the plaintiff rested he had not made out a prima facie case, and that at the close of the case there was no proof to justify the verdict. The railroad company had a right to stop its train and eject the trespassers, and in doing so it had the right to use such force, in a reasonble way, under the circumstances, as was necessary to accomplish that object. In doing this it was, as we have seen, liable only for willful, wanton, or intentional injury inflicted by its servants. The proof shows no such injury. Nor does this evidence disclose any chain of circumstances, which justifies an inference of such injury, or that more force was used than was necessary to rid the train of these parties. The repeated and persistent efforts of these wrongdoers to accomplish their unlawful designs

the proof shows to have been of such a character as to merit the condemnation of a court of justice. The parties were not only committing a wrong against the railroad company, but also against the passengers, who, because of the unlawful purposes of the trespassers, were disturbed and delayed on their journey. Upon careful examination of this record it is difficult to see how reasonable minds can differ as to the effect of, and inference to be drawn from, the evidence. The inevitable conclusion from the proof seems to be that the plaintiff has shown no right of recovery because of the unfortunate death of his son.

We are of the opinion that the motion for nonsuit ought to have been granted; that, as this was not done, when both parties rested and submitted the case, a peremptory instruction to the jury to return a verdict in favor of the defendant would have been proper; and that, as no such instruction was given, and none requested, the court should have granted the motion for a new trial. Having come to this conviction it is deemed unimportant to decide the other questions presented.

The judgment must be reversed, with costs, and the cause remanded, with directions to the court below to grant a new trial. It is so ordered.

BASKIN, C. J., and McCARTY, J., concur.