## JENKINS v. STEPHENS

No. 4466.   Decided September 1, 1927.   Rehearing Denied December
21, 1927.   (262 P. 274.)

*N. J. Harris,* of Ogden, for appellant.

*Pratt & Pratt,* of Ogden, for respondent.

THURMAN, C. J.

The complaint in substance alleges plaintiff's ownership and possession for more than ten years last past of certain real property situated in Weber county, Utah. The land is described with reference to particular subdivisions of the United States survey. It is also alleged that at all times mentioned in the complaint the defendant

was the owner of certain lands lying south and west of plaintiff's said land and adjacent thereto. It is then alleged that from time immemorial there has been and still is a certain natural swale or water course entering the said land of plaintiff at or near the northeast corner thereof and running thence southwesterly through and across plaintiff's land to and onto the said land of the defendant, carrying off the flood and waste water from plaintiff's land, and from land higher in elevation than the plaintiff's, including waste water from irrigation on defendant's land adjoining plaintiff's land on the south.

It is further alleged in said complaint that during the fall of 1917 defendant wrongfully and unlawfully constructed a dam or dyke across said water course along the east line of her said land near the plaintiff's land, said dam or dyke being about 300 feet long and 5 feet in height and that defendant has ever since wrongfully and unlawfully sustained said dam across said natural water course or swale in such manner as to prevent the water flowing down said water course, and thereby caused said water to back up and flood over and upon the land of the plaintiff and kill valuable crops then growing thereon; that it prevented the cultivation of said land and rendered the same unfit for cultivation or the production of valuable crops thereon and caused stagnant water to accumulate and remain on plaintiff's premises, thereby preventing him from using or enjoying the same practically rendering plaintiff's property and home thereon unfit for habitation, to his damage in the sum of $5,000. Finally, it is alleged that by reason of the maintenance of said dam about 7½ acres of plaintiff's land was rendered unfit for cultivation and in order to reclaim it plaintiff constructed certain drains and established a pump on his premises for the purpose of drawing off the water from his land, at a cost of $1,500; that after making said improvements defendant wrongfully prevented the use thereof for the purpose mentioned, thereby rendering said drainage system practically worthless.

Plaintiff prays judgment for damages in the sum of $5,000 as general damages, and special damages in the sum of $1,500, and costs.

For answer to the complaint defendant admits plaintiff's ownership of the land claimed by him down to September 29, 1917, and for want of information denies his ownership thereafter. Admits defendant's ownership as alleged in the complaint, and denies every other allegation. For a further defense defendant alleges that on September 29, 1917, in an action in the district court of Weber county, wherein the plaintiff herein was defendant and the defendant herein was plaintiff, it was found and adjudged that there was no stream of water upon the land of plaintiff described in this action; that the water on said land was not subject to appropriation; that the water flowed into a depression or sump from which the plaintiff pumped the water to the higher portions of his said land. Defendant further alleges that if plaintiff sustained any damage it was by reason of his own acts.

The jury to whom the case was tried rendered a verdict for the plaintiff in the sum of $3,600. From the judgment entered thereon defendant appeals and assigns as error refusal of the court to instruct the jury as requested by defendant, also the giving of a certain instruction, insufficiency of the evidence to sustain the verdict, and that the judgment is contrary to law. Appellant also assigns as error the denial of her motion for a nonsuit, her motion for a new trial, and the admission of certain evidence over her objection.

Evidence was admitted over appellant's objection relating to respondent's claim for special damages. This claim was withdrawn by respondent before he concluded his evidence, and the court instructed the jury accordingly. The defendant nevertheless contends that the admission of the evidence was prejudicial and assigns it as error. We are of opinion that the error, if any, was effectually cured

by withdrawing from the jury the claim for special damages and the instructions of the court in relation thereto.

No evidence was offered by appellant in support of the former judgment attempted to be pleaded in her answer, and no reference is made thereto in her brief. It appears, therefore, that that defense was abandoned.

The features of the pleadings above referred to will not be further considered.

The material issues presented by the pleadings are as follows: First, whether or not there was a natural swale or water course running through the land as alleged in the complaint; second, whether or not the defendant constructed, or caused to be constructed, a dam or dyke across the water course as alleged; third, whether or not plaintiff was damaged thereby and to what extent; and, fourth, if damaged, whether or not it was caused by plaintiff's act.

There is substantial evidence to the effect that plaintiff is the owner of the land described in his complaint; that it consists of about 15 acres; that it slopes from the north toward the center and from the south towards the center, and slopes generally from the northeast to the southwest, the whole constituting a swale or depression running through the land towards the southwest portion thereof. The topography of the land is such that the drainage from precipitation and from irrigation on plaintiff's land and other adjacent lands lying upon a higher level all find their way towards the southwest portion of plaintiff's land. At that point the water crosses the west boundary line of plaintiff's land and flows thence across the defendant's land in a northwesterly direction, finally emptying into a big hollow on defendant's land, which hollow conveys the water to the Weber river. There is also evidence to the effect that willows and other forms of vegetation characteristic of a water course grew along portions of the ditch across defendant's land leading to the big hollow. There is no conflict in the evidence as to the contour of the land as above

described and that the natural drainage thereof is into the big hollow. The evidence presented by plaintiff clearly shows that such was the natural condition when plaintiff came into possession of his land in 1910.

The question as to whether there was a natural water course or swale running through the land as charged in the complaint was submitted to the jury under proper instructions, and by its verdict the jury evidently found the existence of the water course as charged. That finding is sustained by the evidence. There is also evidence to the effect that when plaintiff entered into possession of the land in 1910 he found evidences of ditches and drains through his land, evidently for the purpose of collecting and conveying water towards the point where the water passes into defendant's land as above described. He cleaned out such ditches and improved the system or drainage. He found upon a survey of his land that the fence on his supposed west boundary line was about eighty feet east of where it should be. He moved the fence to conform to the west boundary line, and at that point laid a tile pipe in the bottom of the ditch where the water flowed into defendant's land and covered the pipe with dirt to a depth of about 18 inches. The pipe extended about 125 feet into defendant's land.

In 1917, according to the testimony of plaintiff's witnesses, defendant constructed, or caused to be constructed, a dam or dyke 200 or 300 feet long, running north and south, at and on the west side of plaintiff's said fence on his west boundary line, and at the point where plaintiff laid his pipe. It is claimed that the dam was 5 or 6 feet in elevation and effectually stopped the flow of water through said pipe and caused it to back up on plaintiff's land and destroy some of the crops growing thereon. There is a sharp conflict in the evidence as to the construction of the dam, defendant claiming that all that was done was by way of repairing a road used by her in going to and from her land lying south. Many other matters pertaining to the alleged

construction of the dam are hotly contested, but the evidence on the part of plaintiff is clear and unambiguous to the effect that the dam was constructed as above stated and that it had the effect of backing up the water on the plaintiff's land to the injury of some of the crops growing thereon and to the permanent injury of the land itself. It appears from the evidence without contradiction that about an acre and a half of his land in the southwest corner was completely covered with water and that flags and bulrushes are now growing thereon. The evidence of plaintiff and his witnesses is to the effect that from five to seven acres of his land is in part actually covered with water and in part so soaked with water as to be practically valueless for the production of crops.

The case was tried and submitted to the jury on the theory that the measure of damages was the depreciation of the value of plaintiff's land by the construction of the dam and backing up of the water and in addition thereto the damage to the crops growing thereon, less the expenses of harvesting and marketing the same.

As to the damages, plaintiff testified that seven or seven and a half acres of his land was in part flooded and the remainder soaked with water; that it was worth $400 per acre before the dam was constructed and only $25 an acre afterwards; that the remaining seven acres were depreciated in value to the extent of $300 per acre; that his potato crop was damaged in the sum of $150; that he harvested his asparagus in the spring before the dam was constructed in the fall following, and in the following year after the dam was constructed he could only raise about on-seventh of what he harvested the year before from the same land. The evidence showed that it takes four years for asparagus to commence to bear, but when it commences it will produce from year to year for an indefinite period of time. Plaintiff had two acres of asparagus, the first crop of which was in 1917. Other evidence produced by plaintiff tended to show that land in Weber county of the nature of plaintiff's

land, when producing asparagus, has a market value of $1,000 per acre. As plaintiff had two acres of asparagus injured to the extent of six-sevenths of its value, and five acres depreciated to the extent of $375 per acre, and the remaining seven acres to the extent of $300 per acre, it is not difficult to see how the jury found that the plaintiff had been permanently damaged in the sum of $3,600, to say nothing about damage to his potato crop and other damages which it is not necessary to enumerate here.

While the value of the land as estimated by plaintiff and his witnesses appears on its face to be extraordinarily high, yet it is not so when we consider the capacity of the land for productivity as testified to by defendant's witnesses. It is true defendant's witnesses were testifying from a different angle, but I cannot see that that makes any difference. Defendant's witnesses, in line with the contention of defendant, testified in effect that plaintiff's land had not been injured at all by the water except an acre and a half in the southwest corner, and as to that defendant testified it had always been in that condition. Expert witnesses of high character who went on the land and examined it testified for defendant that the land was highly productive, especially for truck gardening; that all of the land except the acre and a half covered with water and growing flags and rushes was in good condition for cultivation and the production of crops. Mr. Rasmussen, one of these witnesses, said the land would produce a celery crop worth $500 to $800 per acre; that it would produce an asparagus crop worth from $400 to $700 per acre, cabbage from $200 to $300 per acre, and so on. Another witness, Mr. Marsh, testified also to the remarkable productivity of the land, and so did Prof. Israelson of the Agricultural College. So that, in view of all the evidence as to the producing power of the land when properly cultivated and not injured by flooding or saturation, together with its market value as above stated, this court would not be justified in holding that

the evidence was insufficient to sustain the verdict for the amount of damages found by the jury. In fact, it is not contended by defendant that the damages are excessive. Her contention, in the last analysis, is that there is no evidence to sustain a verdict for any damages whatever; that there is no evidence of a natural water course, no evidence of the construction of a dam, and no evidence of any damage.

This is the second appeal of the case on the same pleadings and on the same character of evidence. *Jenkins* v. *Stephens*, 64 Utah 317, 231 P. 112. At the former trial of the case plaintiff obtained judgment. On appeal to this court the judgment was reversed upon an error of law. The court, however, refused to disturb the verdict as far as concerned the sufficiency of the evidence, holding that if there is any substantial evidence in an action at law to sustain the verdict or finding of the court this court will not reverse the judgment except for errors of law. The same rule is applicable on this appeal. We are compelled to hold upon all the material issues of fact that there is ample evidence to sustain the verdict, and for that reason the assignment of error on the grounds of insufficiency of the evidence is not sustained.

But appellant assigns as error the refusal of the court to instruct the jury as requested by defendant. There are several of such requests involving the same question of law. The defendant earnestly insists the refusal of the requests was prejudicial error. The following sufficiently present the question of law upon which appellant relies:

"You are instructed that if you find from the evidence that plaintiff placed the tile pipe under the Stephens roadway as claimed by him, that the same projects for some distance onto his land, and that it carried off the drainage from his premises onto the Stephens land during the years 1912 to 1917, then it was the duty of the plaintiff himself to maintain said drain, to keep the same open and in repair, and the defendant was under no obligation whatsoever to maintain the same, and if you find that plaintiff's lands were flooded and damaged by reason of the failure of the plain-

tiff to keep the said drainpipe open, and to remove obstructions therefrom which prevented the said waters from flowing freely through the same, then you are instructed that the plaintiff is responsible for any injury which he many sustain by reason thereof, and is not entitled to recover any damages from the defendant therefor."

"You are instructed that the defendant has alleged that the damages if any, suffered by the plaintiff, were due to his own contributory negligence, and to his own fault, and that the defendant is not responsible therefor. And if you believe from the evidence that the defendant constructed a dam or dyke on her roadway, and if you further believe from the evidence that the water backed up and damaged plaintiff's premises, or that the same was caused by reason of the failure of the plaintiff to maintain and keep in good repairs his drain pipe under the said roadway on defendant's premises, and if such failure was the proximate cause of the injury to the plaintiff's lands, then you are instructed that the plaintiff is not entitled to recover in this action, and your verdict should be in favor of the defendant, no cause of action."

"You are instructed that if you find from the evidence that the defendant constructed the dam or dyke upon her said roadway, and if you further find that the plaintiff knew that same was being constructed, and knew that the same would prevent water flowing from his premises, and would cause the same to be backed up upon his lands, thereby injuring or destroying the same, then it became the duty of the plaintiff to protest against the construction of said dam, to clean out and maintain the drainpipe under the said roadway, and if he failed to do so, he was guilty of contributory negligence, and cannot recover in this action."

"If you find that the plaintiff should have removed the said waters from his said premises, if you find his premises were flooded by reason of a dam or dyke constructed on defendant's roadway, then you are instructed that it was the duty of the plaintiff to open the headgate in the said dam and permit the waters to flow from his said premises, and if he failed to do so he cannot recover damages for the injury to his premises resulting from such failure, and the defendant would be entitled to recover."

It is necessary in this connection to refer briefly to the evidence to which these requests apply. The plaintiff testified that in 1912 he laid the tile pipe in the bottom of the ditch at the west boundary line of his land, and that the pipe

extended into his own land about 4 feet and about 125 feet south into the defendant's land; that he used the pipe to carry the water off his land from 1912 until 1917, when the defendant constructed a dam running north and south across the pipe in such manner that the dirt came down inside his fence, covering his pipe and causing the water to back up on his land. He testified he saw the workmen constructing the dam and that they put into it about 250 loads of dirt. He also testified he knew they were doing it to back the water up on his land; that he made no protest against them doing it, intimating in substance that it was because of strained relations existing between them. He also testified that near the south end of the dam defendant in 1918 constructed a pipe or culvert across the dam north and south, and that there was a headgate connected therewith which could be raised and lowered for the purpose of shutting off the water or permitting it to flow through; that the culvert was about a foot below the top of the dam, and if opened it would not drain off all the water, but would lower it 3 or 4 inches. He also stated he never touched the headgate, as he did not want further litigation; nor did he at any time inform defendant that the water was backing up on his land by reason of the dam.

It does not appear that either in 1917 or 1918, or at any time before this action was commenced in August, 1921, that the west end of plaintiff's pipe, laid in 1912, was obstructed or in any manner interfered with by defendant. No reason appears therefore why plaintiff might not have removed the obstruction from the end of the pipe, which was on his land, so that the water could pass through the pipe as it had done before the dam was constructed. That would have effectually drained all the water from his land as it had always done before.

Counsel for respondent take the position that where the wrong complained of is done willfully and intentionally no duty rests upon the injured party to do anything by way of preventing or mitigating the damage. In the first place, re-

spondent did not allege in his complaint that the injury was either willful or intentional. In the second place, it is doubtful if such a charge could be sustained by any evidence in the case. The defendant insisted that she had a road at the point in question leading from the county road on the north to her land on the south, and that what plaintiff calls a dam was is fact only a road which she had used for a long time, and that the work done thereon of which plain-' tiff complains was merely by way of leveling up and repairing the road, and that the elevation thereof was not increased.

The question as to whether she had a road at that place prior to 1917 is one of the hotly contested features of the case. We do not deem it necessary to decide what the truth is respecting this contention. We refer to ▪ the matter here only for the purpose of emphasizing the fact that the depositing of the dirt so as to cover the east end of plaintiff's pipe, and thereby backing up the water on plaintiff's land, may have been inadvertent rather than intentional. If defendant had a road there, or desired to construct a road, she had the right to do so, and to any elevation she saw fit, as long as she did not obstruct the flow of water through plaintiff's pipe. If there had been an open ditch there instead of a pipe, and defendant had filled the ditch and dammed up the water, it would be practically conclusive that the injury was intentional. In that kind of a case the following authorities relied on by respondent might have some application. 20 R. C. L. 104, § 90; *Hawks* v. *Slusher*, 55 Or. 1, 104 P. 883, Ann. Cas. 1912A, 491 and note; *Aiken* v. *Holyoke St. R. Co.*, 184 Mass. 269, 68 N. E. 238; *Jensen* v. *R. R. Co.*, 44 Utah 100, 138 P. 1185. But we are of opinion the rule announced in the following *Atchison, T & S. F. R. R. Co.* v. *Jones*, 110 Ill. App. 626; cases is the correct rule as applied to a case of this kind; *Louisville & N. R. Co.* v. *Moore*, 31 Ky. Law Rep. 141, 101 S. W. 934, 10 L. R. A. (N. S.) 579; *Sweeney* v. *Montana C. R. Co.*, 19 Mont. 163, 47 P. 791; *Walrath* v. *Redfield*, 11

Barb. (N. Y.) 368; *Sloss-Sheffield S. & I. Co. v. Mitchell,* 161 Ala. 278, 49 So. 851; 3 Farnham, Waters, p. 2630.

In *Atchison, T. & S. F. R. R. Co.* v. *Jones,* supra, which was a case of flooding land by an obstruction, the court, at page 645 of the report, says:

"We believe the law to be that if the plaintiff could by a reasonable expenditure under the circumstances, in the exercise of reasonable diligence, by work on his own land, have lessened the damages or obviated them in whole or in part, it was his duty to have done so. In such case the measure of damages would be the loss sustained before he could in the exercise of reasonable diligence have abated the nuisance, together with all cost and expense of abating it. The authorities seem to be unanimous that in an action for the recovery of damages for a breach of contract, it is the duty of the injured party to use reasonable diligence and prudence to avoid unnecessary damages. The rule seems to be the same in actions for tort."

The court then quotes from 8 Am. & Eng. Ency. L. the following paragraph at page 605:

"As it is the duty of a party injured by a breach of contract or tort to make reasonable effort to avoid damages therefrom, such damages as might by reasonable diligence on his part have been avoided are not to be regarded as the natural and probable result of the defendant's acts. There can be no recovery, therefore, for damages which might have been prevented by reasonable efforts on the part of the person injured."

Farnham, Waters, supra, says:

"Under ordinary circumstances, one about to receive an injury which he may avert by slight expense is bound to do so; and if he does not he will not be permitted to throw the whole loss upon the wrongdoer. Under this rule one injured by an obstruction in his drain, who, neglecting to take reasonable means to save himself from injury, suffers damage to a large amount, which a small outlay would have prevented, can recover only the latter sum."

In *Louisville & N. R. R. Co.* v. *Moore,* supra, the court, at page 580 of the report (101 S. W. 935), says:

"It appears from the proof that the railroad company put in a pipe which turned the water from one side of the track to the other, and thus let it run down on the land in controversy, where it made a pond, which stood until it dried up. It also appears from the proof

that the land in controversy runs to Benson creek, and that it is only a short distance from the railroad to the creek; that a furrow might have been plowed that would have taken all the water off and avoided the trouble. In view of this proof, on another trial, the court should instruct the jury that it was the duty of the plaintiffs to exercise ordinary care to protect their property from the water, and that no damages should be allowed which might have been avoided by the exercise of ordinary care on their part. *Raleigh* v. *Clark*, 114 Ky. 732, 71 S. W. 857."

In *Sweeney* v. *Montana C. R. Co.*, supra, the last paragraph of the syllabus reflects the opinion of the court. It reads:

"It was error to exclude evidence to show that, at a small expense for riprap, the injury could have been avoided or materially diminished."

In *Sloss-Sheffield S. & I. Co.* v. *Mitchell*, supra, the fifth paragraph of the syllabus states the rule as follows:

"A land owner, whose land is overflowed by the obstruction of the natural flow of a creek, is in duty bound to make reasonable effort to prevent the accumulation of damages."

These cases are all in point on the question presented here. Many other more or less to the same effect are cited in the note 22 L. R. A. (N. S.) 684-686. The annotator in that case, at pages 684, 685, says:

"It is undoubtedly the general rule that one whose riparian rights are interfered with, or where property is flooded, because of the obstruction of a natural water course, must exercise reasonable care and diligence to minimize the damages, and, if any part of his damage is the result of his own failure to exercise such care and diligence, whatever may be stated to be his measure of damages, to that extent, at least, he is not entitled to recover."

We are of opinion that the rule should have been applied in the case at bar. The requests of defendant above quoted are somewhat inartistic in form, but we are of opinion they are sufficiently clear and specific to invoke the rule announced by the authorities above referred to. There is some doubt in the mind of the court as to the fourth request above quoted. The reason the plaintiff assigned for not

opening the headgate so as to permit the water to flow through was that it would injure other parties. If that were true, it might excuse the omission, especially if the parties to be injured were other than the defendant.

We have serious doubts if the rule relating to contributory negligence technically applies to a case of this kind. In *Gniadck* v. *Northwestern I. & B. Co.*, 73 Minn. 87, 75 N. W. 894, the court refers to the rule applicable here as the doctrine of "avoidable consequences." That appears to me to be a more apt expression, for it hardly seems logical to charge a plaintiff with contributory negligence when he has done nothing whatever to cause the injury. We think, however, whatever may be the proper form of expression, it was the plain duty of the plaintiff in this case to give notice to the defendant that he was being injured by her dam, and give her an opportunity to prevent the injury, or to remove the obstruction himself and thereby avoid the injury. In such case the defendant would have been chargeable with whatever reasonable expense plaintiff might necessarily incur in removing the obstruction.

We are of opinion the failure to instruct the jury as requested was prejudicial error for which the defendant is entitled to a new trial.

Many other errors were assigned and argued by defendant. We are opinion they are without merit, but in any event it is not probable that the matters complained of will occur again in the event of a new trial.

Before concluding the opinion, there is another question that should receive brief consideration. At the October, 1926, term of court, respondent interposed a motion to strike appellant's bill of exceptions on the grounds that it was not served in time. The court after deliberation, denied the motion. Respondent now insists that we reconsider the question and grant the motion. It appears that the order denying the motion for a new trial was entered September 28, 1925, and notice thereof served on defendant on the same day; that on October 26, 1925, de-

fendant's time for serving her bill was extended by the court for a period of 30 days; that on November 27, 1925, a further extension was granted of 60 days, and on January 14, 1926, a further extension was granted for 30 days. On February 26, which was one day too late, another 30 day extension was granted, and five extensions were granted thereafter before the bill was finally served. It appears that during all of that time the defendant was delayed on account of being unable to obtain a transcript of the reporter's notes, which had been seasonably ordered after the denial of her motion for a new trial. The respondent filed his motion in the court below to strike the bill on the grounds that it was not served within the time required by law. We will not refer to the sections of the statute relating to this question for the reason that they have been referred to in numerous decisions of the court, heretofore rendered. Among which are the following: *Bryant* v. *Kunkel et al.*, 32 Utah 377, 90 P. 1079; *Warnock Ins. Agency* v. *Investment Co.*, 35 Utah 542, 101 P. 699; *Metz* v. *Jackson*, 43 Utah 496, 136 P. 784; *Tooele Improvement Co.* v. *Hoffman*, 44 Utah 532, 141 P. 744; *Moyle* v. *McKean*, 49 Utah 93, 162 P. 63; *Davis* v. *Lynham et al.*, (Utah) 247 P. 294; *Morgan* v. *O. S. L. R. R. Co.*, 27 Utah 92, 74 P. 523, In all of these cases except the last two this court held that the bill was not served in time, and in such cases where relief was sought in the court below it was held by this court that the showing for such relief was insufficient. In practically all of such cases there was the grossest kind of neglect on the part of the appellant without any semblance of excuse therefor. The neglect existed for such length of time as to show conclusively that it was not the result of mistake or miscalculation, but either inexcusable ignorance of the law or palpable neglect of professional duty. In the case at bar, in response to the motion to strike the bill in the court below, the defendant immediately appealed to the court for relief supporting her motion by affidavits as to her own diligence and the affidavit of her attorney employed in the case. His

affidavit was to the effect that he had made a mistake in computing the time; that he thought he had until February 26, 1926, and for that reason failed to apply for a further extension on February 25, the day when the time expired. Upon these affidavits the trial court denied the motion to strike, and settled the bill.

It is quite evident from all the circumstances connected with the preparation of the bill that it was not a case of inexcusable neglect or lack of reasonable attention to the business in hand. The bill of exceptions consists of more than 700 pages of typewritten matter, and there is every reason to believe that the appeal was taken in good faith. The conduct of appellant's counsel in preparing the bill of exceptions clearly manifests an intention to prepare and serve the bill in time. There does not appear to have been any lack of diligence on his part, so that we are of opinion the trial court was justified in finding that the failure of appellant's counsel to apply for a further extension before his time expired was due entirely to his mistake in computing the time. In that respect the case is distinguished from the cases above referred to.

Compiled Laws Utah 1917, § 6619, among other things, provides that the court "may, also, upon such terms as may be just, relieve a party or his legal representative from a judgment, order, or other proceeding taken against him through his mistake, inadvertence, surprise, or excusable neglect." In view of that statute and the facts above enumerated connected with the case, we do not feel warranted in holding that the trial court abused its discretion in refusing to strike the bill.

For the reasons hereinbefore stated, the judgment of the trial court is reversed and the cause remanded for a new trial, at respondent's cost.

CHERRY, STRAUP, and HANSEN, JJ., and McCREA, District Judge, concur.

FRICK, J., did not participate herein, being absent when cause was submitted.